**Philip and Mary BANKS on Behalf of Patrick BANKS Plaintiffs,**

v.

**DANBURY BOARD OF EDUCATION Defendant.**

**No. 3:01 CV 2040 GLG.**

United States District Court, D. Connecticut.

Jan. 8, 2002.

Marc P. Mercier, Beck & Eldergill, Manchester, CT, for Plaintiffs.

Stephen M. Sedor, Shipman & Goodwin, Michael Peter McKeon, Sullivan, Schoen,

Campane & Connon, Hartford, CT, for Defendants.

### MEMORANDUM DECISION

GOETTEL, District Judge.

The Plaintiffs, Philip and Mary Ellen Banks, on behalf of their son, Patrick Banks (P.B.), bring this action pursuant to 20 U.S.C. § 1400 et seq. of the Individuals with Disabilities Education Act (IDEA). The plaintiffs appeal from the decision of a due process hearing officer claiming that the hearing officer improperly determined that the Planning and Placement Team (PPT) recommended an adequate Individualized Education Program (IEP) for P.B. and that they are not entitled to reimbursement for placement costs under the IDEA for the 2001–2002 school year. The parties have now filed cross-motions for summary judgment. We affirm the hearing officer's decision; the plaintiffs' motion is DENIED and the defendant's motion is GRANTED.

### I. FACTUAL BACKGROUND

The following facts are relevant to the disposition of this case. P.B. is currently seventeen years old and has been identified as having a learning disability. Specifically, he suffers from dyslexia and attention deficit disorder. P.B.'s parents unilaterally placed him in a special education program at the Kildonan School (Kildonan) in 1997[1], when he was entering the sixth grade.

On December 8, 2000, the Danbury School Board (Board) convened a PPT meeting regarding P.B.'s triennial reevaluation, which was scheduled for the 2000–2001 school year. The PPT meeting was for the purpose of determining the appropriate components of P.B.'s triennial reevaluation. The team recommended that P.B. should undergo a neuropsychological evaluation and a central auditory processing evaluation, both of which were to be conducted by evaluators of the plaintiffs' choice. Additionally, the Board would choose its own evaluator to perform P.B.'s speech and language evaluation.

Subsequently, on May 24, 2001, the Board convened another PPT meeting, which was for the purposes of (1) conducting P.B.'s annual review, (2) reviewing the results of P.B.'s triennial reevaluation[2], (3) developing an IEP and determining P.B.'s placement for the 2001–2002 school year. Following its consideration of the information before it, the PPT recommended an IEP to be implemented at Danbury High School. The parents felt differently and wanted P.B. to continue in his current placement so that he could have the continued benefit of Kildonan's more intensive and focused program. The plaintiffs, therefore, objected to the PPT's recommendations. As result, the Board initiated a special education hearing with the State of Connecticut, which was held over a four-day period beginning on August 1, 2001.

1. Though P.B.'s parents unilaterally placed him at Kildonan in 1997, such placement was continued by agreement between the Danbury School Board and the parents through the 2000–2001 school year. Because P.B.'s parents did not agree to the proposed IEP for the 2001–2002 school year, his continued placement at Kildonan for that year was unilateral.

2. The May 24, 2001 PPT meeting did not include a review of the results of the central auditory processing evaluation because Karen Pollock, the evaluator who administered the testing, had not completed her report as of the that date. The Board decided to convene an additional PPT meeting on July 6, 2001 for the purpose of reviewing Pollock's report and modifying the IEP as necessary. Based on the results of Pollock's report, however, the PPT did not change the recommended IEP established at the May 24, 2001 meeting.

During the course of the administrative hearing, the Hearing Officer, Mary Elizabeth Oppenheim, heard testimony from a number of witnesses, including: Mr. and Mrs. Banks; Joseph Ruggiero, Academic Dean of the Kildonan School; Thomas Pelliciari, the Board's speech and language pathologist; Joyce Emmett, the Board's Director of Special Education; John Goetz, the Principal of Danbury High School and Judith D'Andrea, a special education teacher at Danbury High School.

In her final decision and order dated September 21, 2001, the Hearing Officer ruled in favor of the Board. She found that P.B. was entitled to special education services under the IDEA for his specific learning disability. Further, she found the PPT's proposed IEP and placement at Danbury High School to be appropriate for the 2001–2002 school year, and that the plaintiffs were not entitled to reimbursement for costs they incurred resulting from P.B.'s placement at Kildonan for the 2001–2002 school year. Additional facts will be set forth as necessary.

## II. DISCUSSION

### 1. *Subject matter jurisdiction*

■ Before reviewing whether the Hearing Officer's findings of fact and conclusions of law were supported by a preponderance of the evidence, this court must first determine if subject matter jurisdiction is proper because the defendant argues that it is not. *See* Fed.R.Civ.P. 12(h)(3). In support of its argument that federal jurisdiction is not proper in this case, the defendant relies on Connecticut General Statutes § 10–76h (1996), the Connecticut Agencies Regulations § 10–76h–3 (2000), and two federal cases.[3]

Section 10–76h, Conn. Gen.Stat., provides in relevant part, "[N]o issue may be raised at [a due process] hearing unless it was raised at a[PPT] meeting ...." the regulations, Conn. Agencies Regs. § 10–76h–3(h), provide in relevant part, "A hearing officer has the authority to dismiss for lack of subject matter jurisdiction any request to the extent that such request raised issues which have not been raised in a planning and placement team meeting prior to a hearing." As such, the Board argues that because the plaintiffs failed to object specifically to the Board's proposed IEP at the May 24, 2001 and subsequent July 6, 2001 PPT meetings, they cannot now argue that the Hearing Officer improperly determined the IEP to be appropriate. We note that "[n]othing in the IDEA prohibits a requirement that issues must be first raised at a PPT meeting before they may be raised at a due process hearing." *Lillbask v. Sergi*, 117 F.Supp.2d 182 (D.Conn.2000). The Board's argument, however, must fail.

During the May 24, 2001, PPT meeting, the plaintiffs objected to the PPT meeting itself because they did not have Pollock's report, despite the fact that she informed the Board that the absence of her report should not delay the PPT meeting. The plaintiffs, nevertheless, objected to the entire meeting. They also expressed several "concerns", that can be fairly characterized as objections, about the IEP and its proposed goals and objectives, including the number of students in each class, the lack

---

**3.** Both cases, *Lillbask v. Sergi*, 117 F.Supp.2d 182 (D.Conn.2000), and *E.S. v. Ashford Bd. of Educ.*, 134 F.Supp.2d 462 (D.Conn.2001), are inapposite to the defendant's argument because they address specifically the constitutionality of Connecticut's requirement that issues must first be raised at a PPT or face possible dismissal by a Hearing Officer at a subsequent due process hearing. They do not address the type of question presented by this case, i.e. whether the plaintiffs by objecting at a PPT, preserved such issues for a due process hearing.

of one-to-one teaching, the prospect of team-taught classes, and the qualifications of teachers. Before the meeting concluded, the plaintiffs again stated that they would not "agree or disagree" with the Board's proposed IEP. The Board responded to the parents' objection by initiating a due process hearing on June 4, 2001.

Prior to the due process hearing, on July 6, 2001, the Board convened a PPT for the purpose of reviewing the audiological and central auditory evaluation performed by Pollock. Based on the information before it, the PPT left the May 24, 2001, proposed IEP unmodified. During the July 6, 2001, PPT meeting in which the plaintiffs participated via telephone, they again objected to the IEP. On a summary sheet summarizing the meeting, a notation occurs stating that the "parents did not request any change to [the] IEP [and they] [w]ould not accept or reject the [IEP] until they receive written documentation of the audiological and central auditory evaluation." Rec. of Admin Hearing, Vol. 2, Ex. 3, B19 at 2 of 2.

Based on this notation, the Board argues that the plaintiffs' acceptance of the IEP was contingent on Pollock's report and that her completion of the report satisfied that contingency leaving no objections to the proposed IEP. The Board claims that the "plaintiffs were obligated ... to raise any subsequent objection to the substance of the IEP at the July 6 meeting." Def.'s Memo for Sum. Jud. at 31. The Board, however, cites no authority for such an assertion and its argument loses sight of the fact that the plaintiffs objected to the entire May 24, 2001, meeting including the goals and objectives of the PPT's proposed IEP. Moreover, the parents repeated their previous objection by stating that they did not accept the PPT's proposals at the July 6, 2001 meeting, which incorporated the same IEP proposals fashioned at the May 24, 2001 meeting.

Because the plaintiffs objected to the IEP at the May 24, 2001 and July 6, 2001 PPT meetings, their claims were properly preserved. Further, the defendant did not object during the due process hearing to the plaintiffs' raising any of the issues it now claims are barred. The Hearing Officer, as well, did not exercise her authority to dismiss any such issues for lack subject matter jurisdiction. Consequently, the plaintiffs have satisfied the requirements set forth in Conn. Gen.Stat. § 10–76h and Conn. Agencies Regs. § 10–76h–3(h), as well as the IDEA's "broadly applicable requirement that [they] first exhaust administrative remedies." *Polera v. Bd. of Educ. of Newburgh,* 288 F.3d 478, 483 (2d Cir.2002). Having addressed the court's subject matter jurisdiction, we now turn to our review of the Hearing Officer's decision.

2. *Review of Hearing Officer's Decision*

■ The plaintiffs challenge the Hearing Officer's findings and conclusions regarding the appropriateness of the proposed IEP and seek reimbursement for their expenses incurred by unilaterally placing P.B. at Kildonan for the 2001–2002 school year. In such cases, courts typically apply the two-part *Burlington* test. *School Comm. of Burlington v. Dep't of Educ. of Massachusetts,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Under this test, the court determines first whether the proposed IEP is appropriate. To be appropriate, the state must comply with the procedural requirements of the IDEA and fashion an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998). "The School Board shoul-

ders the burden of proof with respect to both of these issues." *M.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers,* 231 F.3d 96, 102 (2d Cir.2000). Second, if the proposed IEP is found to be inappropriate, the court determines if the plaintiff's choice of placement is appropriate. *Id.* Because the plaintiffs do not contend that the Board failed to comply with the procedures set forth in the IDEA, the only issue to be resolved regarding this appeal is whether the proposed IEP is reasonably calculated to enable P.B. to receive educational benefits. *Id.*

"The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with the administrative hearing and review officers. Their rulings are then subject to an 'independent' judicial review." *Walczak,* 142 F.3d at 129 (citations ommitted). On appeal, we employ a modified de novo standard of review, which "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities." *Id.* Consequently, we are mindful that courts generally lack the " 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' " *Id.* (citations omitted). Due weight, therefore, must be given to the Hearing Officer's conclusions, and we base our review and subsequent decision on a preponderance of the evidence standard. *Id; see* 20 U.S.C. § 1415(i)(2)(B)(iii).

Our review of the challenged IEP requires that we look to the administrative record for "any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan." *Id.* at 130. (citations omitted). To find such evidence, the Second Circuit has held that we should look to test scores and "similar objective criteria even in cases where a disabled child has been educated in self-contained special education classes." *Id.* Our review of the record does not reveal the objective evidence necessary to show that P.B. is likely to regress under the proposed IEP; to the contrary, it shows that he is likely to progress.

P.B. entered Kildonan's program in 1997. In March and April of that same year, Ann Terezakis, an educational consultant, performed an independent evaluation of P.B. Her testing revealed that P.B. displayed "significant reading, writing and phonological deficits... [and that he] appear[ed] to need a systematic and intensive intervention in phonological awareness, reading, and spelling if those skills are going to be increased and provide any level of independence for him by the time he is a high school student." Record of Admin. Hearing Vol. 1, Exhibit 2, Parent's Documents 1 page 10 of 12.[4] In May, 1997, Robert S. Kruger, Ph.D., performed a neurobehavioral assessment of P.B. He reported that P.B. was "severely dyslexic" and that his parents should "consider unilateral placement for [him] in a school specialized for teaching dyslexic and lan-

---

**4.** The administrative record consists of two volumes and four exhibits. Volume one includes two exhibits. The first exhibit is the Hearing Officer's decision. The second exhibit includes numerous documents that are categorized as parents' documents 1–34. Volume two consists of exhibits three and four. Exhibit three includes numerous documents that are categorized as the Board's documents 1–21. Exhibit four consists of the transcripts of the due process hearing. All references to the administrative record will include the volume (Vol.), exhibit (Ex.), and document number, as well as the page number within each document. The document numbers will be abbreviated as they are in the record. The Letter P, followed by a number will signify the parents' documents and the letter B followed by a number will signify a Board document.

guage impaired students." Rec. of Admin. Hearing, Vol. 1, Ex. 2, P3 at 5, 6 of 7. When P.B. was 12 years and one month, Wendy Marans, M.S., evaluated P.B.'s communication skills. She concluded that P.B. had severe learning needs. Rec. of Admin Hearing, Vol. 1, Ex. 2, P5 at 8 of 10.

Against the background of P.B.'s disability as described by Terezakis, Dr. Kruger and Marans, and following several years in self-contained special education classes at Kildonan, a PPT meeting convened on May 24, 2001, to review the results of P.B.'s triennial reevaluation, and his progress to that point.[5] On behalf of Kildonan, Dr. Reggiero testified that P.B. had dramatically increased his skills in the past year, and that he had achieved many IEP objectives. Dr. Reggiero, however, cautioned that P.B.'s improvements were tentative and his skills needed to be worked on, especially regarding time management, note taking and the use of technology. Though he expressed some concern in that regard, Dr. Reggiero stated that P.B. had improved in each of those areas of concern. Rec. of Admin. Hearing. Vol. 1, Ex. 2, P24 at 47, 48, of 113.

Pellecari also testified. Based on his testing and evaluation, he determined that P.B. possessed age-appropriate grade level communication skills. Dr. Reggiero agreed with Pellecari's assessment and stated that P.B.'s individual needs presented no speech issues in terms of language processing.

Both Kildonan and Dr. Gladstone separately evaluated P.B. through various testing. There was some discrepancy, however, between the results of the two tests. The testing that Dr. Gladstone performed determined P.B.'s reading comprehension skills to be at the fourth-grade level, while Kildonan measured his reading comprehension skills to be at a 5.5 grade level, which was down from the previous year's measurement of a 7.6 grade level. There is evidence on the record, however, that discounts the reading results of both evaluations.

Notwithstanding the fact that Kildonan's testing revealed a decrease in P.B.'s reading scores, Dr. Reggiero testified that P.B.'s reading comprehension skills were "probably on an eighth-grade level," and that P.B.'s tutor informed him that "his reading skills [have] gotten a lot better." Rec. of Admin. Hearing. Vol. 1, Ex. 2, P24 at 9, 10, of 113. She also stated P.B.'s "most notable gains this year were in expository writing [and that he] is well on the way to becoming a skilled writer." Defendant's 9(c)(1), Item 15, page 5. Further, the record provides some explanation for P.B.'s low test scores in reading comprehension in regard to the testing that Dr. Gladstone performed. Through their testimony, both P.B.'s mother and Dr. Reggiero related that P.B. was not feeling well the day of Dr. Gladstone's evaluation, and the testing conditions were different from what P.B. was accustomed; this could well have resulted in lowered test scores.

Pollock also performed testing on P.B. Her findings were considered at a PPT meeting subsequent to the May 24, 2001 meeting. In her report, she concluded that "it is imperative when planning for next year, that [P.B.] be placed with instructors whose teaching philosophies and styles are consistent with his needs." Plaintiffs' 9(c)(1) statement, Item 43, page 10. She also approved, without objection,

---

5. It should be noted that prior to the May 24, 2001 PPT meeting several other PPT meetings convened for the purposes of developing, revising and reviewing P.B.'s IEP and evaluating his progress in accordance with 34 C.F.R. § 300.343 (2000). *See also* 20 U.S.C. § 1414.

all of the proposed IEP modifications that the team recommended at the May 24, 2001 meeting.

From his start at Kildonan in 1997 to the present, P.B. has made much progress. In fact, the record provides this court with sufficient evidence to show that P.B. is likely to progress under the proposed IEP. Though Dr. Reggiero testified that P.B.'s recent advancements were tentative and that continued placement at Kildonan was necessary, other evidence countenanced the opposite.[6] Aside from the Dr. Reggiero's assertion that P.B. should remain at Kildonan, and the parents' assertion that P.B. needs one-to-one training utilizing the Orton–Gillingham method, which Kildonan provides, there is no evidence to support their claim that P.B. is likely to regress under the proposed IEP. P.B.'s testing scores have improved significantly, and where they have regressed or not improved, viable explanations exist to support the Hearing Officer's conclusions. For instance, to counter the parents' assertion, D'Andrea, a special education teacher with extensive training in the Orton–Gillingham method, testified that the one-to-three teaching ratio is more appropriate for a student like P.B. than a one-to-one ratio because it allows P.B. to interact with and learn from other students like him. Additionally, the PPT fashioned its proposed 2001–2002 IEP goals and objectives based on the testimony and numerous reports from Kildonan's staff, as well as the reports from Dr. Gladstone, Pellicari and Pollock.

We agree with the Hearing Officer's findings, based on the evidence, that the proposed IEP adequately addressed P.B.'s individual needs. A summary of the PPT's recommendations are as follows: "reading instruction utilizing the Orton–Gillingham method with Ms. D'Andrea for one period a day with a primary focus on decoding; one period a day of resource room support focused on study and organizational skills and academic support; participation in regular education classes in science and social studies that was team-taught by a special education teacher and a regular education teacher, with both special education and regular education students; weekly one to one counseling for one-half hour; one period a day with a reading specialist, focusing on comprehension; a regular education geometry class for one period per day, with the support of the resource teacher and the classroom teacher; and an elective of [P.B.'s] choice." D's 9(c)(1) statement, Item 66 at 19.

The PPT's recommendations, as set forth above, address both P.B.'s strengths and weaknesses. For instance, P.B. would receive an additional period a day to focusing on reading comprehension and decoding, to address his weaknesses in that regard. Because there was a discrepancy regarding the accurate level of P.B.'s reading skills, the PPT, based on the information before it, assessed his reading skills at a high sixth or seventh-grade level. Significantly, the IEP allows for adjustment if his reading skills prove to be otherwise.

---

**6.** The Hearing Officer noted in her decision that Dr. Ruggiero lost credibility when he claimed that it was necessary for P.B. remain at Kildonan because he had both made progress and not made progress. The Hearing Officer found Dr. Ruggiero's testimony to be "unconvincing, as he did not observe the Board High School program ... [or] meet with the special education teacher who will be assigned..." to P.B. Def.'s Ex. P at page 4

Item 11. While this court does not decide whether Dr. Ruggiero had to have observed the Board's program and/or meet with P.B.'s special education teacher to give credibility to his testimony, evidence of P.B.'s advancements in conjunction with other evidence, including witness testimony and numerous reports, supports the Hearing Officer's conclusion that the proposed IEP was appropriate.

P.B. will also work on his study and organizational skills with the resource room teacher during one period each day. Dr. Reggiero and Dr. Gladstone expressed some concern about P.B.'s emotional issues, including his lack of self-esteem. Based on those concerns, P.B. will attend a weekly one-half hour counseling session with a school social worker who holds a master's degree in social work. Moreover, he will be integrated with non-disabled students in regular education classes and team taught classes, which comports with the IDEA's preference for the least restrictive educational setting. *Id.;* 20 U.S.C. § 1412(a)(5).

The objective evidence shows that P.B. has improved significantly during his four years of education at Kildonan. Absent evidence to the contrary, there is no reason to believe that P.B. must attend Kildonan, or a facility with a similar program, to continue progressing. While this court understands that loving parents can create a better special education program aimed at maximizing their child's potential, that is not the standard by which we review the Hearing Officer's findings and conclusions. *P.J. v. State of Conn. Bd. of Educ.,* 788 F.Supp. 673, 678, (citing *Kerkam v. McKenzie,* 862 F.2d 884, 886 (D.C.Cir. 1988)). In comparison with Kildonan's self-contained special education program, the proposed IEP is admittedly less intensive and less focused on P.B.'s personal and academic needs in that it allots far fewer hours and individualized special education. That, however, does not make the IEP inappropriate because the harsh reality is that the "IDEA does not require states to develop IEPs that maximize the potential of handicapped children.... It represents only 'a basic floor of opportunity'" for them. *P.J.,* 788 F.Supp. at 678.

## III. CONCLUSION

Based on the objective evidence in this case, this court finds that the Board has shown by a preponderance of the evidence that the proposed IEP is reasonably calculated to enable P.B. to receive educational benefits. While the proposed IEP is not the "Cadillac" of programs so to speak, it does not need to be as long as it keeps the door of public education open for P.B. Because the proposed IEP allows for P.B. to access meaningful educational benefits, in that it is likely to produce progress instead of merely creating an opportunity for only trivial advancement, it is reasonably calculated to enable the P.B. to receive educational benefits. The plaintiffs may keep their son in any special education program that they wish. The Board, however, does not have to reimburse the parents for unilaterally placing P.B. at Kildonan for the 2001–2002 school year because it complied with the requirements of the IDEA.

The Hearing Officer's findings and conclusions are affirmed, the plaintiffs' motion for summary judgment is **DENIED** and the Defendant's motion for summary judgment is **GRANTED**. The clerk is directed to enter judgment accordingly.

**SO ORDERED.**