**M.S., on behalf of S.S. his minor child, Petitioner–Appellee,**

v.

**BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF YONKERS, Respondent–Appellant.**

No. 2142, Docket No. 00–7178

United States Court of Appeals, Second Circuit.

Argued: July 14, 2000

Decided: Oct. 26, 2000

Neal Howard Rosenberg, New York, New York, for Petitioner–Appellee.

James P. Drohan, New York, New York (Lawrence W. Thomas, Donoghue, Thomas, Auslander & Drohan, Mark J. Krone, Querrey & Harrow, Ltd., on the brief), for Respondent–Appellant.

Before: WALKER, Chief Judge, JACOBS and SOTOMAYOR, Circuit Judges.

JACOBS, Circuit Judge:

The Board of Education of the City School District of the City of Yonkers ("the School Board") appeals from a judgment of the United States District Court for the Southern District of New York (Parker, *J.*), entered under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, ordering payment of reimbursement to the parent of a learning disabled child for tuition at a private school that educates learning disabled students only.

The School Board found that third-grader S.S. was learning disabled, and it developed an individualized education program ("IEP") that recommended one daily period of resource room services in a group of no more than five students for the remainder of the third-grade year. A proposed IEP for S.S.'s fourth-grade year recommended two such periods a day. The child's father, petitioner-appellee M.S., objected to the proposed IEP, unilaterally enrolled S.S. in a private school that educates only learning disabled students, and sought tuition reimbursement from the School Board. The School Board refused

to pay, and M.S. appealed the School Board's decision through the administrative process implemented by New York State to conform with the requirements of IDEA. *See* 20 U.S.C. § 1415 (1994); N.Y. Educ. Law § 4404 (McKinney 1995 & Supp.1999) (amended 1995). The state review officer determined that the proposed IEP was inadequate but ultimately refused to order tuition reimbursement because the highly restrictive environment of the private school did not afford an appropriate education for S.S.'s needs.

Dissatisfied, M.S. filed a petition for review in the district court pursuant to 20 U.S.C. § 1415(e)(2) (1994). The district court reviewed S.S.'s progress in the private school, ruled that parents are not bound (as school boards are) to seek the least restrictive learning environment, and reversed the decision of the state review officer on a motion for summary judgment. In view of the deference owed to the administrative ruling that the private school was not an appropriate placement for S.S., we conclude that the administrative ruling should stand and therefore reverse the judgment of the district court.

## BACKGROUND

### A. *Underlying Facts*

The following facts are undisputed. From the age of three until the end of his third-grade year in 1997, S.S. was enrolled in the Yonkers School District program known as PEARLS, an acronym for Program for Early and Rapid Learners. In October 1996—early in S.S.'s third-grade year—M.S. asked that his son be evaluated by the School Board's committee on special education ("CSE"). The CSE learned from S.S.'s teachers that the child was having difficulties with a variety of skills, including handwriting, reading, spelling and arithmetic.

In December 1996, S.S. was evaluated by Dr. Oriole Peterfreund, a private psychologist selected by M.S. Dr. Peterfreund determined that S.S. had a full scale IQ of 109, ranking him at the 75th percentile of his cohort, but that he was performing at second-grade level in reading, spelling and arithmetic, at percentiles 32, 21, and 34, respectively. After a battery of tests, Dr. Peterfreund concluded that S.S. had a learning disability and recommended, *inter alia,* that S.S. "receive intensive individual remediation to enable him to overcome his difficulties and to achieve at a level appropriate for his age and ability." A month later, S.S. was evaluated by Dr. Raymond Copeland, a school psychologist, who concluded that S.S. "is not a candidate for Special Education at this time."

The CSE convened on February 3, 1997 to evaluate S.S.'s learning needs. After considering the teacher reports, the evaluations of psychologists Peterfreund and Copeland, and an assistant principal's observations of S.S. in group settings, the CSE concluded that S.S. should be classified as learning disabled within the meaning of IDEA. The CSE recommended that S.S. remain in the PEARLS program but also receive resource room services in a class of five students for one period per day. M.S. consented to the recommended placement.

The School Board thereafter developed an IEP which stated that S.S. should receive resource room services without specifying how often. M.S. wrote to the CSE expressing concerns. Among other criticisms, M.S. observed that "[t]he annual goals and objectives on [S.S.'s] IEP need to be made much more specific so that we can more readily determine his progress."

On March 10, 1997, S.S. began receiving resource room services one period a day. On April 8, 1997, the director of special education for the Yonkers Public Schools responded to M.S., agreed "that there are not enough goals listed to address [S.S.'s] learning needs especially in the area of handwriting," and recommended that S.S.'s case be referred "back to the CSE for another meeting for a 'case review' to revise the IEP." The director also proposed, subject to M.S.'s view, that this

revised IEP could serve as the IEP for S.S.'s fourth-grade year.

On May 2, 1997, Dr. Peterfreund performed a re-evaluation. The Gates MacGinitie Reading Test, Level C, revealed that S.S. was reading at a mid-second-grade level, the 20th percentile for his cohort. Dr. Peterfreund found "significant deficits in basic skills," and recommended that S.S. "receive intensive remedial instruction geared to his individual learning needs," adding: "Since this is a multifaceted problem affecting many areas of functioning including writing, spelling, language and math in addition to reading, it is felt that a special school setting with small class size that can provide a total learning environment would be the most appropriate placement for [S.S.]."

The CSE reconvened on May 21, 1997 to consider the IEP for S.S.'s fourth-grade year. The CSE recommended a second daily period of resource room services, and presented an IEP reflecting that recommendation.

M.S. did not accept the recommended placement; instead he enrolled S.S. in the Stephen Gaynor School, a private school that educates learning disabled students only. The CSE was advised of this decision by a June 16, 1997 letter from M.S.'s lawyer. M.S. requested an "impartial hearing" to seek tuition reimbursement under IDEA, but agreed to a delay in the hearing after the School Board agreed to arrange transportation to the Stephen Gaynor School. The CSE did not further reconsider S.S.'s situation.

B. *Procedural History: Administrative Hearings*

An impartial hearing as mandated by IDEA, *see* 20 U.S.C. § 1415(b)(2) (1994); N.Y. Educ. Law § 4404(1) (McKinney Supp.1999) (amended 1995), was held on April 23, 1998 to determine whether M.S. was entitled to tuition reimbursement under the test set forth in *School Committee of Burlington v. Department of Education,* 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85

L.Ed.2d 385 (1985) (holding that reimbursement is authorized when the proposed IEP is inappropriate and the private school placement is appropriate). The classification of S.S. as learning disabled was not disputed during this hearing. Testimony was received from the CSE chairperson; one of S.S.'s teachers in the PEARLS program; the special education teacher coordinator at the Stephen Gaynor School; and M.S.

The impartial hearing officer ("IHO") found that M.S. was not entitled to tuition reimbursement on two alternative grounds: that the School Board was providing S.S. with an appropriate education; and that the program at the Stephen Gaynor School was inappropriate for S.S.'s needs.

M.S. appealed the decision of the IHO to a state review officer ("SRO") at the New York State Education Department. *See* 20 U.S.C. § 1415(c) (1994); N.Y. Educ. Law § 4404(2) (McKinney 1995). The SRO affirmed the denial of reimbursement on the ground that though the School Board's IEP was inadequate and inappropriate, the education afforded at the Stephen Gaynor School was also inappropriate.

As to the appropriateness of the education furnished by the School Board, the SRO found that the IEP for S.S.'s fourth-grade year (1997–98) inadequately described S.S.'s needs and the extent of his disability: "Although [S.S.'s] IEP has what appears to be a series of computer generated statements with respect to his academic, social and physical development and management needs, those statements do not include adequate objective data to establish a baseline from which [S.S.'s] progress could be measured during ... 1997–98." The SRO also found that the IEP's annual goals and short-term objectives were "too vague to provide [S.S.'s] teacher with direction about the CSE's expectations." For example, "despite the fact that there is no dispute about [S.S.'s] very weak spelling skills, his IEP goals

and objectives do not address his encoding (spelling) difficulties." In summary, the SRO found that the School Board "failed to meet its burden of proof with respect to the appropriateness of the educational placement which it offered to [S.S.] for the 1997–98 school year because of its failure to adequately describe his educational needs and to construct IEP goals and objectives which specifically addressed those needs."

As to whether M.S. had met his burden of establishing the appropriateness of the Stephen Gaynor School, the SRO found, first, that M.S. "ha[d] not demonstrated that his son's special education needs were addressed" at the Stephen Gaynor School; S.S.'s reading level had not improved at the school and his spelling level had declined. Second, M.S. had not shown that S.S.'s placement at the Stephen Gaynor School was "consistent with the requirement that children with disabilities be placed in the least *restrictive* environment." The SRO was "not persuaded that [S.S.'s] management needs were so severe as to require the highly restrictive placement in a private school. Similarly, while [S.S.] had academic deficits, he had only recently been receiving resource room services and was benefitting from those services when the CSE recommended that he continue to receive resource room services."

## C. *Procedural History: District Court*

M.S. appealed the SRO's decision to federal court, see 20 U.S.C. § 1415(e)(2) (1994), and the court decided the case on cross-motions for summary judgment.

As to the appropriateness of the education furnished by the School Board, the district court "concur[red] with the SRO's determination that the 1997/1998 IEP was not reasonably calculated to enable S.S. to receive educational benefits." The district court emphasized:

- Dr. Peterfreund found in May 1997 that S.S. continued to need significant improvement in word analysis, phonic skills and decoding skills.

- The IEP failed to describe the extent of S.S.'s disability, ignoring his difficulties with word analysis, decoding skills and spelling and ignoring as well that when adding double digits S.S. proceeded from left to right.

- The IEP "failed to include objective data to establish a baseline from which S.S.' progress could be measured during the year."

- The IEP's annual goals were vague.

As to whether M.S. had met his burden of establishing the appropriateness of the Stephen Gaynor School, the district court disagreed with the SRO. The district court emphasized that at his new school:

- S.S. received an individualized program which included frequent use of manipulatives suited to S.S.'s love of hands-on activities.

- S.S. received math instruction in a group of five students, reading instruction in a group of four students, and remedial reading, math and language instruction from specialists in a group of two students twice a week.

- S.S. learned all digraphs, his phonics "improved greatly," and he learned regrouping in math "very satisfactorily." His reading level improved from an initial 2.0 grade-level to a 2.5 grade-level.

- S.S. was given weekly phonetic packets to help his spelling.

The district court also held that the IDEA's least-restrictive environment requirement did not bar reimbursement, relying on *Warren G. v. Cumberland County School District*, 190 F.3d 80 (3d Cir.1999). In *Warren G.*, the Third Circuit held that "[a]n appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement. Thus, the test for the parents' private placement is that it is appropriate, and not that it is perfect." *Id.* at 84 (citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 & n. 8 (3d Cir.1999)).

The School Board appeals the entirety of the district court decision.

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo*. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64–5 (2d Cir.2000); *Muller v. Committee on Special Educ.*, 145 F.3d 95, 102 (2d Cir.1998). Federal courts assess IDEA petitions based on the "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122–23 (2d Cir.1998) (citing 20 U.S.C. § 1415(e)(2) (1994)). However, this assessment "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (considering the Education for All Handicapped Children Act, subsequently amended and renamed IDEA). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206, 208, 102 S.Ct. 3034 (internal quotation marks and citation omitted)); *see also Karl v. Board of Educ.*, 736 F.2d 873, 876–77 (2d Cir.1984) (mandating such deference even when SRO disagrees with IHO).

■ To receive federal funding under IDEA, a state must, *inter alia*, provide to all children with disabilities "a free appropriate public education." 20 U.S.C. §§ 1400(c), 1412(1) (1994); *see also Walczak*, 142 F.3d at 122; *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1115 (2d Cir.1997). When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may re-move the child to an appropriate private school and then seek retroactive tuition reimbursement from the state. *See School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A court may award tuition reimbursement "if it appears (1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs." *Walczak*, 142 F.3d at 129 (citing *Burlington*, 471 U.S. at 370, 105 S.Ct. 1996); *see also Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (emphasizing that award of tuition reimbursement is discretionary); *Muller*, 145 F.3d at 104–05; *Still v. DeBuono*, 101 F.3d 888, 891–92 (2d Cir.1996).

### A. *Appropriateness of IEP*

■ We consider two issues to determine whether the IEP for S.S.'s fourth-grade year was appropriate: (1) whether the School Board complied with the procedural requirements of IDEA, and (2) whether the IEP was "reasonably calculated" to confer "educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034; *accord Muller*, 145 F.3d at 101; *Walczak*, 142 F.3d at 129; *Briggs v. Board of Educ.*, 882 F.2d 688, 691 (2d Cir.1989). The School Board shoulders the burden of proof with respect to both of these issues. *See Walczak*, 142 F.3d at 122.

■ "The initial procedural inquiry is no mere formality." *Id.* at 129. The Supreme Court has stated that "adequate compliance with the procedures prescribed [by IDEA] would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. Accordingly, we normally determine whether an IEP states: "(1) the child's present level of educational performance; (2) the annual goals for the child, including

short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." *Walczak,* 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(20) (1994)).

■ The School Board does not contest the district court's conclusion that the IEP for S.S.'s fourth-grade year failed to meet several of the procedural requirements of IDEA; but the School Board argues that an IEP cannot be invalidated on procedural defects alone. If for no other reason, this argument is unpersuasive because the district court supplemented its analysis of procedural inadequacy with the finding that the "IEP was not reasonably calculated to enable S.S. to receive educational benefits." We therefore consider whether the School Board supported its burden of demonstrating by a preponderance of the evidence that the IEP was "reasonably calculated to enable the child to receive educational benefits"—the second issue identified by *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034.

The district court reviewed the same record on which the SRO relied, and on that record upheld the SRO's ultimate finding. The district court cited the May 1997 evaluation of S.S. by Dr. Peterfreund, which indicated that S.S. continued to have difficulties with word analysis, decoding skills and phonics skills, despite the initiation of resource room services. However, the IEP for S.S.'s fourth-grade year did not reference S.S.'s conceded problems with word analysis and decoding skills, nor did it address S.S.'s spelling problems. The district court therefore agreed with the SRO that the IEP failed to describe the full extent of S.S.'s disability, or to include objective data from which S.S.'s progress could be established. We agree with this conclusion.

■ The district court's finding is generally supported by the observation that for an IEP to be "reasonably calculated to enable the child to receive educational benefits," *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034, it must be "likely to produce progress, not regression," *Walczak,* 142 F.3d at 130 (internal quotation marks and citation omitted). Our *de novo* review of the record reveals evidence that S.S.'s performance was not improving. In December 1996, Dr. Peterfreund found that S.S.'s abilities in reading, spelling and math ranked him at the second-grade level only, and his oral reading rate and oral reading comprehension were slightly below the second-grade level. In May 1997, the proposed IEP for S.S.'s fourth-grade year stated that S.S.'s reading, writing and math abilities were still at the second-grade level, reflecting no progress between December 1996 and May 1997 despite the resource room services provided during part of that time. S.S.'s third-grade teacher also testified that S.S. made no improvements in spelling throughout his third-grade year.

As the School Board emphasizes, however, the record also indicates that S.S. was in fact making progress, as that term is used by *Rowley* and *Walczak.* S.S. received passing grades in third grade and was promoted to fourth grade. Ordinarily, such evidence would be sufficient for the School Board to establish that an IEP was appropriate under IDEA. "[T]he attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak,* 142 F.3d at 130; *accord Rowley,* 458 U.S. at 207 n. 28, 102 S.Ct. 3034 ("When the [disabled] child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit.").

Notwithstanding these indicators of progress, we decline to disturb the SRO's finding, upheld by the district court, that the School Board has not sustained its burden of proof on this point. The School Board agrees that S.S. is disabled within the meaning of IDEA, and admits that it prepared an IEP that failed to describe or consider some of S.S.'s major learning difficulties. Once it is conceded that the IEP is materially incomplete in identifying the learning deficits acknowledged to exist, and the IEP has been found ineffective by the SRO as a tool for setting baselines and measuring progress, the School Board cannot rely on the passing grades it has given and the promotional decision it has made to argue that the remedial measures in the IEP are, as a matter of law, reasonably calculated to deliver educational benefits.

■ The substantial defects and omissions in the IEP deprive the fact-finder of data concerning S.S.'s initial abilities and deficits needed to measure S.S.'s subsequent performance. In light of the deference we owe to the SRO's findings, *see* *Briggs*, 882 F.2d at 693 ("Deference is owed to state and local agencies having expertise in the formulation of educational programs for the handicapped."), and the district court's reinforcement of that finding by pertinent references to the record, we agree that the School Board has not sustained its burden of demonstrating that the IEP was "reasonably calculated" to deliver "educational benefits" to this child.

We therefore conclude that the School Board failed to shoulder its burden of proof with respect to either of the issues identified in *Rowley*, and agree with the district court's conclusion that the proposed IEP for S.S.'s fourth-grade year was inappropriate under IDEA.

B. *Appropriateness of Private School Placement*

■ Once it is established that a school district's IEP is inappropriate, we must consider whether "the private education services obtained by the parents were ap-propriate to the child's needs." *Walczak*, 142 F.3d at 129. We have not previously decided who bears the burden of proving that the private school placement is appropriate. The SRO stated that the burden rests with M.S., and the parties have not briefed the issue. The Third Circuit has held that this burden rests on the parents of learning disabled children. *See Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533 (3d Cir.1995). We agree that the burden falls on M.S. as the party who selected the Stephen Gaynor School. *Cf. School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) ("[P]arents who unilaterally change their child's placement ... without the consent of state or local school officials, do so at their own financial risk."). Because M.S. chose a private school for S.S. that educated learning disabled students *only*, M.S. bears the burden of proving that such a restrictive, non-mainstream environment was needed to provide S.S. with an appropriate education.

The SRO found that the Stephen Gaynor School was an inappropriate alternative placement for S.S. because M.S. failed to demonstrate that the school addressed his son's special education needs during the 1997–98 school year, or that S.S.'s placement in the Stephen Gaynor School was consistent with IDEA's requirement that children with disabilities be educated in the least restrictive appropriate educational environment.

The SRO based his finding on evidence that S.S.'s reading level had not improved and his spelling level had declined during that school year, as well as the fact that the restrictive environment at the Stephen Gaynor School was inappropriate in light of S.S.'s relatively mild disabilities.

■ The district court reweighed the evidence in the record and reversed the SRO's finding that the Stephen Gaynor School was an inappropriate placement under IDEA. The district court concluded

that (i) the SRO's finding that S.S.'s special education needs were not addressed during the 1997–98 school year was "not supported by the preponderance of the evidence in the record" and (ii) the SRO's finding that the Stephen Gaynor School was not the least restrictive environment did not bar reimbursement because "the test for parents' private placement is not perfection," and, in any event, "although not abundantly clear from the record before this Court, given S.S.['s] documented learning disabilities, the environment of the Stephen Gaynor School may well be the least-restrictive environment necessary to provide S.S. with a meaningful education and not just trivial advancement." We believe that the district court did not afford appropriate deference to the SRO. *See Briggs,* 882 F.2d at 693.

As to the issue of S.S.'s special education needs, the district court did not explain why it discredited the SRO's interpretation of the objective evidence, and the court based its findings primarily on non-objective evidence, such as M.S.'s testimony that his son had an increased joy of reading and that he was happier with his friends. We believe the district court thus inappropriately substituted its own subjective judgment about what are appropriate measures for educational progress. *See e.g. Walczak,* 142 F.3d at 130 ("[T]he district court did not point to any objective evidence that led it to reject the administrative officers' conclusions...."); *Kerkam v. McKenzie,* 862 F.2d 884, 887 (D.C.Cir.1988) ("[A] court upsetting the [administrative] officer's decision [about an IEP] must at least explain its basis for doing so."); *Town of Burlington v. Department of Educ.,* 736 F.2d 773, 792 (1st Cir.1984) (noting that in making its own independent ruling, a court must carefully consider the findings made during administrative review "and endeavor to respond to the hearing officer's resolution of each material issue"), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where, as was the case here, the district court's decision was based solely on the record that was before the SRO.

As to the restrictive nature of the Stephen Gaynor School, we recognize that parents seeking an alternative placement may not be subject to the same mainstreaming requirements as a school board. *See Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80, 84 (3d Cir.1999) ("[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect."); *Cleveland Heights–University Heights City Sch. Dist. v. Boss,* 144 F.3d 391, 399–400 (6th Cir.1998) (holding private placement's failure to meet IDEA's mainstreaming requirement does not bar parental reimbursement). Nonetheless, IDEA's requirement that an appropriate education be in the mainstream to the extent possible, *see* 20 U.S.C. § 1412(5)(B) (1994), remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate, as it was here.

Given the deference we owe to the SRO's conclusions regarding the formulation of educational programs, and our review of the record, we defer to and accept the SRO's supportable finding that the Stephen Gaynor School was an inappropriate placement for S.S. Because tuition reimbursement is available only for an appropriate private-school placement, and the SRO made the supportable finding that the Stephen Gaynor School was not appropriate, we reverse the district court's judgment ordering the School Board to reimburse M.S. for the cost of S.S.'s tuition at the school.

## CONCLUSION

For the forgoing reasons, the judgment of the district court is reversed.