**In the Matter of the Application of J.R. and B.R. on behalf of S.R., their minor child, Plaintiffs,**

v.

**BOARD OF EDUCATION OF THE CITY OF RYE SCHOOL DISTRICT, Defendant.**

**No. 04 CIV. 1682WCC.**

United States District Court, S.D. New York.

Nov. 22, 2004.

of Regina Syker and Associates, New York, Sonia Mendez–Castro, Of Counsel, for Plaintiffs.

Shaw & Perelson LLP, Attorneys for Defendant, Poughkeepsie, David S. Shaw, Of Counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs J.R. and B.R. on behalf of S.R., their minor child, bring this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.*, and N.Y. EDUC. LAW § 4404(3), against defendant the Board of Education of the City of Rye School District (the "District"),[1] seeking review of an administrative decision, affirmed by the State Review Officer ("SRO") at the New York State Education Department's Office of State Review, that declined to award them tuition reimbursement for their unilateral placement of S.R. in a private school for the 2002–03 school year.[2] Plaintiffs move for summary judgment and seek an order directing the District to reimburse tuition in the amount of $36,700, and an award of reasonable attorney's fees and costs. (Pls. Mem. Supp. Summ. J. at 11). The District also moves for summary judgment and seeks an order upholding the administrative decisions and dismissing plaintiffs' Complaint. (Def. Mem. Supp. Summ. J. at 26). For the reasons set forth herein, the Court grants defendant's mo-

Law Offices of Deusdedi Merced, P.C., Deusdedi Merced, Of Counsel, Law Offices

1. In addition to the District, plaintiffs initially named as defendants Richard Mills, the Commissioner of the New York State Education Department (the "Department"), and Frank Munoz, a Department employee who is the State Review Officer who heard their administrative appeal. (Complt.¶¶ 10–11). Plaintiffs have voluntarily discontinued their claims against defendants Mills and Munoz pursuant to FED. R. CIV. P. 41(a)(1). (May 5, 2004 Stip. of Dismissal).

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i).

tion for summary judgment dismissing plaintiffs' Complaint, and deny as moot plaintiffs' motion for summary judgment.[3]

## BACKGROUND

The administrative record and the additional evidence submitted by plaintiff reveal the following factual background.[4] S.R. is now a fourteen-year-old eighth-grade student. She has been diagnosed with Trisomy–14 Mosaic Type ("Trisomy"), a genetic disorder that has caused her numerous disabilities, including speech and language impairments, fine and gross motor difficulties, visual problems and an auditory processing disorder.[5] (Hr'g Tr. at 873–74, 1029–30). S.R. also has been diagnosed with bipolar disorder for which she is treated with medication. (Id. at 978). S.R. has been classified as a special education student since she was three years old, and has received from the District a variety of special education services from her preschool years until 2002. In September 2002, plaintiffs enrolled S.R. in the seventh grade at the Eagle Hill School ("Eagle Hill"), a private facility located in Greenwich, Connecticut.[6] (Id. at 840; Complt. ¶¶ 19–20).

While enrolled in the District's elementary and middle schools, S.R. received, in accordance with individual education plans ("IEPs") formulated by the District's Committee on Special Education (the "CSE"), special education services of general education with full inclusion, speech and language therapy, and counseling. (Complt. ¶¶ 19–21; Def. Mem. Supp. Summ. J. at 2). According to plaintiffs, S.R. began to experience increased academic and social difficulties as a sixth grader during the first part of the 2001–02 academic year; these problems at school were accompanied by

3. See, e.g., Flagg v. Yonkers Sav. & Loan Ass'n, 307 F.Supp.2d 565, 569 & n. 4 (S.D.N.Y. 2004) (Conner, J.).

4. The record consists of the transcripts of the hearing before an impartial hearing officer ("IHO") as reviewed by the SRO, the exhibits from that proceeding and newly submitted evidence that includes a medical report by Helen Abramowicz, a psychiatrist who examined S.R. at the request of the District in August 2003. The hearing before the IHO was held over six days in 2003, specifically March 28, April 8, April 24, May 1, May 5 and May 9. The transcript of the hearing is consecutively paginated, and our citations thereto are undated. Unless otherwise noted, citations herein to exhibits refer to those documents submitted by the parties to the IHO and subsequently reviewed by the SRO.

5. S.R.'s medical and developmental problems manifested themselves early in her life. She was diagnosed with apraxia, a neurological speech disorder, by the age of one and a phonological disorder with language delays when she was approximately two and a half years old. (Hr'g Tr. at 851–53). S.R.'s speech and language disabilities continue to impact her articulation of speech sounds, grammar, syntax, word-ordering abilities and

comprehension of information. (Id. at 283). It is undisputed that S.R. is a "child with a disability" under the IDEA. See 20 U.S.C. § 1401(3)(A) ("The term 'child with a disability' means a child: (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (hereinafter referred to as 'emotional disturbance'), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services.").

6. Eagle Hill specializes in teaching children with learning disabilities. It is staffed by teachers trained in special education, as well as clinical psychologists, and each student receives an experienced educational advisor. (Hr'g Tr. at 1268–69; Pls. Ex. JJJ). Eagle Hill has a student-teacher ratio of 4:1. (Pls. Ex. JJJ). It is accredited by the State of Connecticut to provide special education services, and is recognized by the State of New York as an appropriate placement facility for disabled children.

difficulties with her behavior at home.[7] (Complt. ¶ 22; Hr'g Tr. at 871). Plaintiffs met with S.R.'s teachers in October 2001 to discuss these problems, and informed them of her affliction with Trisomy. (Hr'g Tr. at 871–73). Thereafter, plaintiffs requested a CSE meeting because they were concerned about S.R.'s ability to remain in the middle school based on her emotional state that was evidenced by her behavior at home in the evenings; that meeting was held on October 29, 2001.[8] (Id. at 876–77; Def. Ex. 3 at 6).

At the October 2001 meeting, plaintiffs asked the CSE to consider placing S.R. in a self-contained special education class. (Hr'g Tr. at 878; Def. Ex. 3 at 6–7). The CSE declined this request as "unnecessarily restrictive" and not in S.R.'s best interest because reports from her teachers indicated that she was actually adjusting well to middle school. (Def. Ex. 3 at 7). The minutes of the CSE meeting also indicate that the chairperson, special education director Roberta Wiener, believed that many of S.R.'s academic difficulties stemmed from anxieties that would be addressed in subsequent counseling sessions. (Id. at 6). Ultimately, as a result of the October 2001 meeting, the CSE made modifications to S.R.'s IEP that: (1) added a socio-emotional goal directed at improving her in-school behavior; and (2) provided assistance in developing her time management and organizational skills. (Id. at 1, 5).

According to plaintiffs, S.R. continued to struggle during the remainder of the 2001–02 academic year. They testified that she complained frequently about the difficulty of her school work; in April 2002, she wrote a letter to her teachers about her frustration.[9] (Hr'g Tr. at 879–80, 899–900; Pls. Ex. CCC). They also testified S.R. experienced social difficulties as she had few friends and was often bullied and harassed by other students. (Hr'g Tr. at 884–88, 896). Plaintiffs remained in contact with S.R.'s teachers, guidance counselor and school psychologist during this time, but her academic and social problems did not abate. (Id. at 879–902).

In March 2002, the CSE met again to develop S.R.'s IEP for the following 2002–03 academic year. (Def. Ex. 6 at 2).

7. Plaintiffs testified that in October 2001, S.R. had multiple episodes of uncontrolled crying during social situations such as a sleepover birthday party, and that she repeatedly complained about school and the difficulty of the work there. (Hr'g Tr. at 871–72, 1034–37). Plaintiffs also testified that S.R. became uncharacteristically abusive towards her younger sister. (Id. at 870–72).

8. Members of the CSE present at the October 2001 meeting included: (1) chairperson and special education director Roberta Wiener; (2) school psychologist Frances Coleman; (3) plaintiffs; and (4) special education teachers Laura Karetsos and Craig Sandhaus. (Def. Ex. 3 at 6).

9. There is evidence in the record that the letter, characterized by plaintiffs as "poignant," (Complt.¶ 26) was written with the assistance of her father, plaintiff J.R. (Hr'g Tr. at 344–48; Pls. Mem. Supp. Summ. J., Ex. A at 4). Indeed, Coleman, the school psychologist, testified that S.R. discussed the letter with her in one of their sessions, and said S.R. told her that J.R. "suggested that she write the letter, and that her father stood there while she was writing the letter, and I got the impression that he may have dictated some of the letter to her." (Hr'g Tr. at 344–45). Nevertheless, we reproduce the letter from S.R. to her teachers in its unedited entirety:

> I am so frestered, upset, and sad because there is to many tests, quizzes, and projects. At home I am was having trouble sleeping this whole vacation. On Sunday morning, I was crying a lot and I couldn't stop! In school and homework is very difficult and hard for me. I could learn better in small classes. There is too many things in one weak. I am trying to do my best but could do better!

(Pls. Ex. CCC.)

Plaintiffs again requested that S.R. be placed in a self-contained special education class. (*Id.* at 3). According to the minutes of the meeting, the CSE declined this request because, upon consideration of S.R.'s social and academic progress during the year as reported by her teachers, "it would be a disservice to [S.R.] to place her in a more restrictive setting as she is flourishing in the inclusion program." (*Id.*) The CSE did, however, modify the IEP to provide S.R. with a forty-minute session with a resource teacher in the Learning Center four times per week,[10] in addition to modified class projects, and testing and classroom accommodations that included the provision of a word processor and preferential seating. (*Id.*) Later in March 2002, plaintiffs notified the District in writing that they were considering sending S.R. to Eagle Hill for the 2002–03 year, and submitted an appropriate transportation request. (Pls. Exs. AAA, BBB).

With respect to S.R.'s mental health during the relevant time period, plaintiffs had her evaluated by Jeanne Dietrich, a private clinical psychologist, in October 2001. (Hr'g Tr. at 710, 714). In light of their concerns about S.R.'s adjustment to middle school, plaintiffs asked Dietrich to determine whether she should be placed in a private school instead. (*Id.* at 714). Dietrich's subsequent diagnostic testing then revealed that although S.R. valued learning and was interested in school, she had severely compromised language comprehension and visual perception abilities. (*Id.* at 716–24; Pls. Ex. UUU at 8–11). Dietrich also administered academic testing; her administration of the Wechsler Individual Achievement Test (the "WIAT") of S.R.'s mathematical, reasoning, and language abilities demonstrated that, as a result of her language difficulties, she had a generally low level of academic functioning. (Hr'g Tr. at 727–29). Dietrich also found that S.R.'s perceptual difficulties negatively impacted her personality testing as well. (*Id.* at 730–31.) She ultimately recommended that plaintiffs should enroll S.R. in a private school, and obtain additional language therapy for her. (*Id.* at 732).

Subsequently, in June 2002, Dietrich observed that S.R. seemed more stressed than she had been in October.[11] (*Id.* at 739–40). The June 2002 WIAT retesting showed that although S.R. had grown older, her language skills remained at the third-grade level; her math results had, however, improved. (*Id.* at 737–40; Pls. Ex. RR at 5). Dietrich noted that these low scores were consistent with contemporaneous pre-admission test results obtained by Eagle Hill and Windward, another private school to which plaintiffs had considered sending S.R. She reiterated her recommendation that S.R. be enrolled in an intense special education program in a school that could provide a small student-teacher ratio.[12] (Hr'g Tr. at 750–63; Pls.

---

**10.** The Learning Center is a class for special education students who have been mainstreamed. (Hr'g Tr. at 56). It is taught by a special education teacher in a small group setting and is intended to provide additional assistance with study and organizational skills, as well as reinforcement of academic subject learning. (*Id.* at 56–57).

**11.** In June 2002, S.R. was also examined by Cynthia Perry, a child and adolescent psychiatrist. At that time, Perry diagnosed S.R. with bipolar disorder. (Hr'g Tr. at 736, 960–

61, 978). In July 2002, Perry testified that S.R.'s psychiatric condition worsened as she experienced delusional thinking, heard voices and was increasingly agitated. (*Id.* at 978–80). Shortly thereafter, Perry began treating S.R. with medications, including Zyprexa and Depakote, and counseling.

**12.** Coleman, the school psychologist, testified that she considered the decline in the WIAT score in June 2002 a marked aberration that was not representative of S.R.'s ability and progress. (Hr'g Tr. at 369–70). She consid-

Ex. RR at 5).

Thereafter, on August 15, 2002, plaintiffs notified the District in writing that they were enrolling S.R. in Eagle Hill for seventh grade starting in September 2002. (Def.Ex. 7). The CSE then held another review of her IEP on August 28, 2002. (Def. Ex. 9 at 3). At this review, plaintiffs discussed with the CSE S.R.'s bipolar diagnosis and emotional state. (*Id.*; Hr'g Tr. at 172–74). The CSE also heard from Barbara Gaines, the speech and language pathologist, about S.R.'s "dramatic improvement" in speech therapy, and from Karetsos, Sandhaus and Carrie Tartaglia, her sixth-grade teachers, about her continued progress in math and language skills. (Def. Ex. 9 at 2–3). S.R.'s end-of-year grades decline was discussed; the CSE noted that she passed all of her classes, and that factors contributing to the decline were: (1) test anxiety; and (2) S.R.'s awareness that she would not be returning to the District's middle school. (*Id.* at 3). Ultimately, the CSE adhered to its prior decision that S.R. continue with the full inclusion program, but also scheduled her for an additional period per week in the Learning Center. (*Id.* at 1). Thus, the final 2002–03 IEP for S.R. provided: (1) full inclusion with a full-time special education teacher for core subject areas; (2) the Learning Center five times weekly in forty-minute sessions; (3) counseling once weekly for thirty minutes; and (4) speech/language therapy once weekly in a group, and once weekly on an individual basis. (*Id.* at 1). Accommodations for S.R. continued to include computer and word processor access, preferential seating, time extensions, reduced homework and assignments, and pass/fail grading for foreign language courses. (*Id.* at 1, 3).

All members of the CSE, except plaintiffs, agreed to this IEP. (*Id.* at 3). Shortly thereafter, plaintiffs unilaterally enrolled S.R. at Eagle Hill, where she started the seventh grade in September 2002. (Hr'g Tr. at 4).

Plaintiffs filed a request for an impartial hearing on February 3, 2003. (Joint Ex. 1). A hearing was held over six days in the Spring of 2003 before IHO Joseph Quinn, a former school principal with thirty-three years of educational experience. (Hr'g Tr. at 4). Witnesses testifying at the hearing about S.R.'s academic progress and mental health status included plaintiffs, Wiener, teachers Sandhaus, Karetsos and Tartaglia, guidance counselor Susan Salese, and Coleman, Perry, Gaines and Dietrich. The hearing officer issued a written decision in the District's favor on June 18, 2003, finding that: (1) the March 2002 and August 2002 IEPs were "adequate to provide S.R. with a free and appropriate public education in the least restrictive environment"; (2) plaintiffs did not cooperate with the CSE in seeking private placement for S.R.; and (3) plaintiffs' request for tuition reimbursement was "without cause." (IHO Op. at 1). In so concluding, the IHO found credible the District witnesses' testimony that although S.R. was struggling, she was making academic progress in the public school setting. (*Id.* at 5–6).

Plaintiffs appealed the IHO's decision to the SRO, who in October 2003 upheld the ruling denying reimbursement. (SRO Op. at 4). In his written opinion, the SRO concluded that S.R. was on the honor roll and was therefore "performing well, given the limits imposed by her speech and language impairment." (*Id.* at 3). The SRO also noted that modifications to the IEP,

---

ered the scores from the previous administration more reflective of S.R.'s abilities, and stated that the lower score could be a product of residual test anxiety from the final exams. (*Id.*)

including the addition of multiple short-term objectives under larger goals including "social/emotional/behavioral" and "speech/language," demonstrated that the CSE was responsive to plaintiffs' concerns about S.R.'s emotional and psychiatric difficulties and specifically her "manic and psychotic" episode in July 2002. (*Id.*) Ultimately, the SRO dismissed the administrative appeal and declined to reach the propriety of the unilateral Eagle Hill placement, concluding that the "District has met its burden of demonstrating that the proposed placement for the 2002–2003 school year was reasonably calculated to confer an educational benefit on [S.R.] in the least restrictive environment." (*Id.* at 4). Thereafter, plaintiffs brought the present action in this Court for review of the SRO's decision. Additional facts will be set forth as necessary in the Discussion section of this Opinion and Order.

## DISCUSSION

### I. *Governing Law*

#### A. *Substance of the IDEA*

Congress enacted the IDEA to promote the education of children with disabilities. *See, e.g., Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998). The IDEA "provides federal funds to those states that develop plans to assure 'all children with disabilities the right to a free appropriate public education.'" *Id.* (quoting 20 U.S.C. § 1412(1)). "The 'free appropriate public education' mandated by federal law must include 'special education and related services' tailored to meet the unique needs of a particular child, ... and be 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (citations omitted) (quoting 20 U.S.C. § 1401(a)(18), and *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207, 102

S.Ct. 3034; 73 L.Ed.2d 690 (1982)). The IDEA "expresses a strong preference" for the educational mainstreaming of children with disabilities "'to the maximum extent appropriate,'" and therefore "special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Id.* (quoting 20 U.S.C. § 1412(5)); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir.2003). Nevertheless, the IDEA permits education in more segregated settings such as dedicated special education classrooms, the home, hospitals and private institutions "'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" *Walczak*, 142 F.3d at 122 (quoting 20 U.S.C. § 1401(a)(16)). If a "state receiving IDEA funding fails to give a disabled child a [free appropriate public education], the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers*, 231 F.3d 96, 102 (2d Cir.2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001).

Under the IDEA, "[t]he particular educational needs of a disabled child and the services required to meet those needs must be set forth at least annually in a written IEP." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1414(a)(5)). The IEP is to be developed by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Id.* (citing 20 U.S.C. § 1401(a)(20)). An IEP must state: (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child

will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Walczak,* 142 F.3d at 122 (citing 20 U.S.C. § 1401(a)(20)).

New York has elected to meet its IDEA obligations by "assign[ing] responsibility for developing appropriate IEPs to local [CSEs], the members of which are appointed by school boards or the trustees of school districts." *Walczak,* 142 F.3d at 123 (citing N.Y. EDUC. LAW § 4402(1)(b)(1)). New York's education regulations appear to track the IDEA closely as "[i]n developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics; (2) social development; (3) physical development; and (4) managerial or behavioral needs." *Id.* (citing 8 N.Y.C.R.R. § 200.1(kk)(2)(i)).

██ Parents who are ultimately dissatisfied with an IEP may request, pursuant to IDEA-mandated procedures, a hearing to be held before a IHO who is appointed by the school board. *M.S. ex rel. S.S.,* 231 F.3d at 100 (discussing 20 U.S.C. § 1415(b)(2) and N.Y. EDUC. LAW § 4404(1)). At this hearing and throughout the subsequent administrative and judicial appeals process, the school district bears the burden of proving by a preponderance of the evidence that: (1) it complied with IDEA procedural requirements; and (2) the IEP is " 'reasonably calculated' to confer 'educational benefits' " on the student. *M.S. ex rel. S.S.,* 231 F.3d at 102 (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d

690 (1982)). The non-prevailing party may then appeal the IHO's decision to an SRO at the New York State Education Department's Office of State Review. N.Y. EDUC. LAW § 4404(2). A party dissatisfied by the decision of the SRO may then appeal from that determination either by filing an Article 78 proceeding in New York State Supreme Court or by bringing an action in the appropriate federal district court. *Id.* § 4404(3); *see also Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.,* 281 F.Supp.2d 710, 713 (S.D.N.Y.2003).

### B. *Standard of Federal Judicial Review*

██ IDEA actions in federal court generally are resolved by examination of the administrative record in a summary judgment procedural posture. *Antonaccio,* 281 F.Supp.2d at 714. An IDEA action, however, differs from an ordinary summary judgment motion because the existence of a disputed issue of material fact will not defeat the motion. *Id.* Rather, "[f]ederal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim,* 346 F.3d at 380 (citing 20 U.S.C. § 1415(i)(2)(B)). The Second Circuit has emphasized that both it and the "Supreme Court ... have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." *Id.* at 380–81 (citing *Rowley,* 458 U.S. at 204–08, 102 S.Ct. 3034; *Walczak,* 142 F.3d at 129). Thus, although our inquiry certainly is not one of " 'rubber stamp' " review, *M.S. ex rel. S.S.,* 231 F.3d at 100, we nevertheless "must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowl-

edge and experience necessary to resolve persistent and difficult questions of educational policy.' " *Grim,* 346 F.3d at 381 (quoting *Walczak,* 142 F.3d at 129).

■ In reviewing the SRO's determination, we must engage in a two-part inquiry. We first must determine whether " 'the State [has] complied with the procedures set forth in the Act.' " *Grim,* 346 F.3d at 381 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034 (footnote omitted)). If the state has complied with the IDEA procedures, we next must determine whether " 'the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits.' " *Grim,* 346 F.3d at 381 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034 (footnote omitted)). The school district bears the burden of satisfying both prongs of this inquiry by a preponderance of the evidence. *M.S. ex rel. S.S.,* 231 F.3d at 103. If, however, we conclude: (1) that the "proposed IEP was inadequate to afford the child an appropriate public education[;] and (2) that the private education services obtained by the parents were appropriate to the child's needs," we may enter an award reimbursing the parents for the expenses that they incurred with respect to the private placement. *Walczak,* 142 F.3d at 129 (citing *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)); *see also M.S. ex rel. S.S.,* 231 F.3d at 104 (stating that once it is determined that an

IEP is inappropriate, the parents bear the burden of proving that their selection of the private school is appropriate).

## II. *Analysis*

■ The parties' submissions reveal no dispute about the District's compliance with the procedural strictures of the IDEA. Accordingly, we turn our attention to the SRO's decision upholding the IHO's determination that the IEP at issue is " 'reasonably calculated to enable [S.R.] to receive educational benefits.' " *Grim,* 346 F.3d at 381 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034 (footnote omitted)). This determination is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of S.R.'s subsequent progress at Eagle Hill,[13] but rather consider the propriety of the IEP with respect to the likelihood that it would benefit S.R. at the time it was devised. *See Antonaccio,* 281 F.Supp.2d at 724 (noting that this issue has not yet been addressed by the Second Circuit and holding that "the ... IEP ... must be evaluated as of the time the CSE devised the IEP, on June 15, 1999, and the IHO and SRO erred by regarding any information about [the student's] education after that date"). The IEP at issue is reasonably calculated to confer an educational benefit if it is "likely to produce progress, not regression." *Walczak,* 142 F.3d at 130. This progress, however, must be more than " 'trivial advancement.' " *Antonaccio,* 281

---

**13.** In the context of demonstrating the appropriateness of their choice, *see, e.g., M.S. ex rel. S.S.,* 231 F.3d at 104, plaintiffs discuss the "significant progress" that S.R. has made at Eagle Hill. (Pls. Mem. Supp. Summ. J. at 10–11). Plaintiffs also discuss S.R.'s "increasing needs" to date and her desire, expressed at the May 2004 meeting of the CSE, to remain at Eagle Hill or in another self-contained class placement. (*Id.* at 2). That S.R. bene-

fited from Eagle Hill does not mean that she would not have benefited from the District's proposed 2002–03 IEP, and the *ex post* information about her subsequent progress in private school is therefore irrelevant to the inquiry about whether the District's IEP was reasonably calculated to enable her to receive educational benefits in the 2002–03 academic year.

F.Supp.2d at 716 (quoting *Walczak*, 142 F.3d at 130).

■ Our independent review of the record in the present case shows ample support for the administrative determination that a modified continuation of S.R.'s sixth grade inclusion IEP was likely to continue the progress of her educational and social development. Accordingly, the District has proven by a preponderance of the evidence that the IEP was reasonably calculated to provide S.R. with a free appropriate public education. There is ample testimony in the record from S.R.'s regular and special education teachers as to her progress under the inclusion program in the 2001–02 academic year. Karetsos, the special education teacher who team-taught S.R.'s mainstream classes in language arts and social studies, testified that the post-October 2001 modifications reduced some of the stress and improved her language comprehension, class participation, and independent research and writing skills. (Hr'g Tr. at 430, 436–39). Karetsos also testified specifically that S.R.'s writing was increasingly well organized and developed as the year went on. (*Id.* at 438). Karetsos noted that S.R. had a generally positive and pleasant attitude, but experienced anxieties with her final examinations at the end of the year and had expressed concerns about going to a new school the following year. (*Id.* at 442–48, 469–70). She offered her opinion that S.R.'s low test scores at the end of this year reflected these expressed anxieties. (*Id.* at 469–70). Karetsos testified that S.R.'s grades, which reflect homework, tests and class participation, generally were average; indeed, she made the honor roll on four occasions. (*Id.* at 453–54.) With respect to the 2002–03 IEP, Karetsos offered her opinion that it addressed S.R.'s needs, including that of small-group instruction, increased language development, and the need to develop organizational and study skills. (*Id.* at 455–60). She said that the added time in the Learning Center would be beneficial as it previously had helped to relieve S.R.'s anxieties about time pressure in doing her assignments correctly.[14] (*Id.* at 462).

The IHO also heard testimony from Sandhaus, S.R.'s sixth-grade special education math and science teacher. Sandhaus testified that S.R. was a "real eager participant in class," and was "certainly stimulated by the classes we were in and certainly had a lot to offer ... especially in science." (Hr'g Tr. at 569, 573). Sandhaus stated that S.R.'s mathematical and problem-solving abilities progressed through the year under the IEP, and that she remained eager until the final month of the year when issues with respect to anxieties about the tests and her school change arose. (*Id.* at 575, 583). He said that S.R.'s exam performance was not indicative of her mastery of the material or

---

**14.** Tartaglia, a regular education teacher and CSE member who worked with Karetsos and taught S.R.'s sixth grade social studies courses, testified similarly that S.R. "progressed through the year," was "very enthusiastic" and "interested in the subject matter." (Hr'g Tr. at 231–34, 235). Tartaglia testified specifically that S.R. was a "good self-advocate" and would volunteer and "participate eagerly in class." (*Id.* at 235, 237). She testified that S.R.'s writing ability did improve during the year, and she was able to complete the end-of-year research and writing project successfully. (*Id.* at 236–37). Tartaglia testified that S.R.'s progress continued, even as the work became more difficult, but that S.R.'s effort and test scores declined by the end of the year, at which point S.R. told Tartaglia that she would no longer be going to the middle school. (*Id.* at 238–39, 249–51). S.R.'s social studies grades were in the B range, and reflected tests, quizzes, projects and participation; she occasionally failed quizzes, but passed on re-takes. (*Id.* at 243–44).

classroom performance. (*Id.* at 584). Sandhaus, a CSE member, felt that the goals and objectives of the IEP were appropriate and attainable for S.R. (*Id.* at 596–98). He offered his opinion that S.R. would be "greatly stifled in a self-contained class" because she performed so well with the social and academic stimulation offered by the inclusion setting. (*Id.* at 599).

Gaines, S.R.'s speech and language pathologist and also a member of the CSE, testified similarly in support of the IEP, and stated that S.R. had significant speech and language difficulties, but had been making progress throughout the sixth-grade year. (Hr'g Tr. at 319–20). She stated that S.R. did complain to her of unhappiness, for "typical adolescent reasons" such as the teachers and the difficulty of the work. (*Id.* at 311). Gaines recalled S.R. mentioning in the Spring of 2002 that she would be going to Eagle Hill in the Fall for seventh grade and was therefore less concerned about academics in the District middle school.[15] (*Id.* at 312).

Coleman was the psychologist at the middle school while S.R. was in sixth grade there; she had weekly counseling sessions with her. (Hr'g Tr. at 334). Coleman was a CSE member who attended the October 2001, March 2002 and August 2002 meetings. (*Id.* at 350, 352, 360). She testified that they worked on S.R.'s academic and social anxieties during that year, and that S.R. achieved the goals set forth in the IEP with respect to her social and coping skills. (*Id.* at 339–41). Coleman stated that it seemed that S.R.

> really wanted to do well at Rye. I think that was really important to her, and she felt kind of conflicted about leaving Rye. She had friends here and she seemed to like it here.
>
> So the stress at that time to be her ambivalence about whether she was staying or going and how much pressure was on her . . . and there was not a decision made yet about what school she was going to go to and where she was going to be next year. I think all of that created some stress for her.[16]

(*Id.* at 342–43). Coleman had observed S.R. in class, and noted that she was attentive and involved in the mainstream setting; S.R. asked questions and participat-

---

**15.** We note that this testimony is further corroborated in the report of Helen Abramowicz, a psychiatrist who performed an independent examination of S.R. in August 2003 at the request of the District. (Pls. Mem. Supp. Summ. J., Ex. A at 1). Abramowicz's report, submitted by plaintiffs as an exhibit to their Memorandum, states that S.R. "said she didn't study much for finals because her parents told her she was going to another school." (*Id.* at 3). Abramowicz has interviewed S.R. about her anxieties about adolescence and her family difficulties, reviewed her medical, psychological and educational histories. (*Id.* at 1–5). Abramowicz has offered her opinion that the District "could offer an appropriate program" for S.R. that would include

> four counseling sessions with [Coleman] per week, a social skills group, and super-

vised homework help and study during the school day so that [S.R.] would have minimal homework to do at home. Since [S.R.] is so motivated to pursue a range of interests and has so many strengths, she should be in the least restrictive environment possible with a great deal of extra support. (*Id.* at 5).

**16.** Coleman testified further that it seemed that S.R.

> did like Rye. She talked about having friends and she talked about the classes. She seemed to like her classes. I think she very much liked the Special Ed teachers.
> She talked about how she was struggling in science, but I think overall she really liked it here and both socially and academically.
> (*Id.* at 343).

ed in class. (*Id.* at 362–64). Coleman also noted that S.R. generally behaved appropriately in class. (*Id.* at 364). Coleman testified that with respect to leaving Rye, S.R. stated that plaintiffs had told her not to talk about leaving at school.[17] (*Id.* at 342).

We conclude that the SRO properly upheld the IHO's determination that the 2002–03 IEP was reasonably calculated to confer an educational benefit on S.R. In so concluding, we give the requisite weight to the decisions of impartial state education officers who are far better versed in educational policy and practice than this Court, and therefore, better suited to the difficult task of evaluating S.R.'s progress under the previous and proposed IEPs. *See Grim,* 346 F.3d at 383 (reversing the district court's conclusion because "in violation of *Rowley,* the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy—effective methods of educating dyslexic students—in direct contradiction of the opinions of state administrative officers who had heard the same

evidence."); *see also Sherman v. Mamaroneck Union Free Sch. Dist.,* 340 F.3d 87, 93 (2d Cir.2003) (noting in reversal of district court's decision that "[w]ere we reviewing a decision reached after a plenary trial involving credibility determinations, instead of a district court review of an administrative decision entitled to deference, we would likely affirm. But under a standard of deferential review, the administrative decision here, which is amply supported by the evidence in the record, must prevail as a matter of law."). The testimony of S.R.'s teachers about her conduct in class, and the documentary evidence of her grades, which were well above passing until Spring 2002, provided evidence of her progress under the prior IEP that had been formulated by the CSE.[18] *See, e.g., Sherman,* 340 F.3d at 93–94 (noting that although "[p]assing grades are ... often indicative of educational benefit," "failing grades are not dispositive," and finding that the school district did not violate the IDEA by not providing a calculator to a student when there was evidence to support the conclusions of the IHO and SRO that the student's "failing grades in Math

17. The IHO also heard testimony from Salese, S.R.'s sixth-grade guidance counselor. (Hr'g Tr. at 654). Salese testified that S.R. had friends and generally "good coping skills." (*Id.* at 657–58). She also testified that S.R. became upset around final examinations, because it was the first time any of the children took a cumulative examination that covered the entire year, and S.R. was "especially sensitive" to test and performance anxieties. (*Id.* at 667–70).

18. Plaintiffs point to the decline in S.R.'s scaled scores on the Educational Records Bureau ("ERB") writing test administered each year in the fourth, fifth and sixth grades as evidence of the IEP's failure with respect to her writing skills. (Pls. Reply Mem. Supp. Summ. J. at 7–8). Plaintiffs note that her ERB scores deteriorated progressively with respect to the performance expected of students on her grade level. For example, by November 2001, when S.R. was in sixth

grade, she was still functioning below the level of a third grader taking the ERB. (*Id.* at 7). Plaintiffs also cite a similar decline in S.R.'s performance on the examinations administered pursuant to the Comprehensive Testing Program III ("CTP"), a more demanding standardized test given by the District to compare its students' performance to those nationally and in other suburban schools. (*Id.* at 8). The IHO was, however, entitled to credit: (1) Dr. Wiener's testimony that the ERB is a regular education test administered to all students, and is not considered specifically by the CSE because it is not a special education achievement or diagnostic examination; and (2) the testimony of Debra Fishman, S.R.'s special education and resource teacher, that her performance on the CTP, considered by the CSE, placed her in the "average" range nationally. (Def. Mem. Opp. Summ. J. at 15–16; *citing* Hr'g Tr. at 138–39, 1237, 1248–49).

3A were due to his failure to make a sufficient effort"); *see also Walczak*, 142 F.3d at 130 ("[T]he attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress."); *Mather v. Hartford Sch. Dist.*, 928 F.Supp. 437, 446 (D.Vt.1996) ("Grades, socialization skills, level of participation, consistency of effort and commitment to studies are all relevant in determining whether the whole individual has progressed in his or her education."). Moreover, our review of the record revealed numerous factual disputes with respect to S.R.'s demeanor and academic progress, including reasons for her declining test scores, the resolution of which necessarily required the IHO to make a credibility judgment. Thus, on this second level of review of the IHO's decision, we accord the deference, traditional on appellate review, to his assessment of the credibility of those witnesses who testified before him. *See Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F.Supp.2d 375, 396 (N.D.N.Y. 2001) (noting that "the IHO has had the benefit of viewing all of the witnesses and judging their credibility"); *Wolfe v. Taconic–Hills Sch. Dist.*, 167 F.Supp.2d 530, 534 (N.D.N.Y.2001)(reversing SRO's decision "denying reimbursement based on equitable factors" when "the SRO necessarily rejected the IHO's determination concerning the credibility of the witnesses without the benefit of hearing the testimony").

We cannot help but sympathize with the plight of plaintiffs and S.R. Our review of the record before us demonstrates that Eagle Hill is an educational institution of very high quality; it may well be the best school in the region for a learning disabled child such as S.R. Nevertheless, neither our sympathy, nor more importantly the IDEA, entitles S.R. to the " 'best education that money can buy' " at the expenditure of the District's finite financial resources.

*See, e.g., Walczak*, 142 F.3d at 130 (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C.Cir.1984) (Ruth Bader Ginsburg, J.)); *see also Antonaccio*, 281 F.Supp.2d at 726 (noting that the IDEA "does not require a school district to provide 'everything that might be thought desirable by loving parents' " (quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir.1989))). We are bound to uphold the 2002–03 IEP because it responded to S.R.'s needs and provided her with an opportunity for meaningful progress. *Walczak*, 142 F.3d at 132–33. We conclude that SRO properly upheld the decision of the IHO, and therefore correctly denied plaintiffs reimbursement for their placement of S.R. at Eagle Hill for the 2002–03 academic year.

## CONCLUSION

The Court concludes that defendant Board of Education of the City of Rye School District has proven by a preponderance of the evidence that the 2002–03 IEP was reasonably calculated to confer an educational benefit on S.R. and therefore that the state review officer properly upheld the impartial hearing officer's decision to that effect. The state review officer and the impartial hearing officer therefore correctly denied plaintiffs reimbursement for their placement of S.R. at Eagle Hill for the 2002–03 academic year. The Court grants defendant's motion for summary judgment dismissing plaintiff's Complaint and denies as moot plaintiffs' motion for summary judgment. Judgment shall be entered accordingly.

SO ORDERED.