Steven and Maureen MATREJEK,
Plaintiffs,

v.

BREWSTER CENTRAL SCHOOL
DISTRICT, Defendant.

No. 06 CIV. 1113(CM).

United States District Court,
S.D. New York.

Jan. 9, 2007.

Rosalee Charpentier, Family Advocates, Inc., Kingston, NY, for Plaintiffs.

James P. Drohan, Donoghue, Thomas, Auslander & Drohan, Hopewell Junction, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS MOTION

McMAHON, District Judge.

Plaintiffs appeal from a decision of a State Review Officer, in which the SRO (1) affirmed the decision of an Independent Hearing Officer that the defendant district had failed to provide a Free Appropriate Public Education ("FAPE") for their severely learning disabled son during the 2004–05 school year (albeit on grounds not relied on by the IHO), but (2) reversed the decision of the IHO that the parents were entitled to tuition reimbursement for their unilateral placement of their son at Kildonan School because they failed to demonstrate that Kildonan was a proper placement for the boy.

After reviewing the administrative record and giving appropriate deference to the opinion of the SRO, I grant defendant

District's motion for summary judgment and deny the cross-motion by plaintiffs.

### Standards for IDEA Review

The following principles of law govern an appeal from an administrative decision under the Individuals with Disabilities in Education Act ("IDEA").

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

 Plaintiffs who bring suit under IDEA must first exhaust the administrative remedies available to them under the statute. A party who disagrees with his child's individualized education plan ("IEP") or other decisions made regarding services for their child must request an impartial due process hearing before the state or local educational agency. See 20 U.S.C. §§ 1415(f),(1). For children in New York's Early Intervention Program ("EIP"), this means a parent or guardian must initially seek review of her child's placement through an impartial due process hearing conducted before an administrative law judge. See N.Y. Pub. Health Law § 2549. Only after the administrative procedures are exhausted may an aggrieved parent seek court review of the adequacy of the IEP. See Riley v. Ambach, 668 F.2d 635, 640 (2d Cir.1981); Heldman v. Sobol, 962 F.2d 148, 158 (2d Cir.1992); Mrs. W. v. Tirozzi, 832 F.2d 748 (2d Cir. 1987); Hope v. Cortines, 69 F.3d 687 (2d Cir.1995). The "failure to exhaust deprives a district court of subject matter jurisdiction over the [action]." Engwiller v. Pine Plains Central School District, 110 F.Supp.2d 236, 245 (S.D.N.Y.2000).

### LIMITED DEFERENCE TO ADMINISTRATIVE PROCEEDINGS

 The SRO's decision is subject to independent judicial review. However, as the United States Supreme Court has cautioned, this fact "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities..." Board of Education v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Federal courts may not simply rubber stamp administrative decisions, but they must give "due weight" to the results of administrative proceedings, mindful that judges lack the specialized knowledge and experience required to resolve persistent and difficult questions of educational policy. Walczak v. Florida Union Free School Dist., 142 F.3d 119, 129 (2d Cir. 1998). As the Second Circuit noted in Walczak, deference is particularly appropriate where, as here, the SRO's review has been thorough and careful. In this regard, I must note that the decision of the State Review Officer explores the evidence thoroughly, makes detailed factual findings that are supported by the evidence, and cogently explains the reasons for the conclusions reached. The SRO's decision is well-reasoned and well-supported by citations to relevant portions of the record. I reject plaintiff's argument that the SRO's decision is not owed the degree of deference I am expected to give it.

### STANDARDS ON REVIEW OF DECISION DENYING REIMBURSEMENT FOR UNILATERAL PARENTAL PLACEMENT

 Where, as here, we are dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A Board of Education may be required to pay for educational services obtained for a student by his or her parent, if and only if, three conditions are met: (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim. Burlington School Committee v. Dept. of

*Education,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). At the time of the independent hearing in this matter, the law in this circuit placed the burden of proof on the first issue on the district, regardless of who initiated the proceeding, and the parents had the burden of proof on the others. *M.S. v. Board of Education of the City School District of Yonkers,* 231 F.3d 96, 102, 104 (2d Cir.2000). However, the United States Supreme Court has since ruled that the party who requests an impartial hearing bears the entire burden of proving that the services offered by the Board were inadequate. *Schaffer v. Weast,* 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). Although the Supreme Court stated that this requirement applied equally to whatever party sought to challenge the IEP, it is inconceivable that the school district would ever challenge an IEP that it devises. This means, as a practical matter, that the burden of proving the inadequacy of the services offered by the district rests, like everything else, on the parents.

█ The parents can satisfy their burden of proving that the district's plan did not afford their child a FAPE by establishing either (1) that the state did not comply with the procedural requirements of IDEA; or (2) that the challenged IEP was not "reasonably calculated to enable the child to receive educational benefits." *Rowley, supra,* 458 U.S. at 206–07, 102 S.Ct. 3034.

## EFFECT OF PROCEDURAL FLAWS ON PROVISION OF FAPE

█ Procedural flaws do not automatically require a finding of a denial of a FAPE. Only procedural inadequacies that cause substantive harm to the child or his parents—meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP—constitute a denial of a FAPE. *Knable v. Bexley City School District,* 238 F.3d 755, 766 (6th Cir.2001), cert. denied, 533 U.S. 950, 121 S.Ct. 2593, 150 L.Ed.2d 752 (2001); *Grim v. Rhinebeck,* 346 F.3d 377, 383 (2d Cir. 2003). Recent amendments to IDEA (effective July 1, 2005), provide that a hearing officer may find a child did not receive a FAPE only if procedural inadequacies: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits. 20 U.S.C. 1415(f)(3)(E)(ii).

## LEAST RESTRICTIVE ALTERNATIVE

IDEA strongly favors the placement of a student in the least restrictive placement where the student can receive a FAPE. 20 U.S.C. § 1412(a)(5).

## PARENTS' BURDEN ON UNILATERAL PLACEMENT

█ The parents' burden to prove that the school they have chosen for a unilateral placement is appropriate is stringent but not impossible to meet. The test for the parents' private placement is that it is appropriate, not that it is perfect. *M.S. v. Board of Education of City School District of City of Yonkers,* 231 F.3d 96, 105 (2d Cir.2000), *cert denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *see also Warren G. v. Cumberland County School District,* 190 F.3d 80, 84 (3d Cir.1999). The parents satisfy their *Burlington* burden by showing that their unilateral placement offered an educational program that met their child's special needs. *M.S.,* 231 F.3d at 102; *Walczak,* 142 F.3d at 129. The parents' unilateral placement need not have certified special education teachers or an IEP for the dis-

abled student in order to qualify as appropriate. *Florence County School District Four v. Carter,* 510 U.S. 7, 14, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

Moreover, while students with disabilities should be educated in the least restrictive environment, 20 U.S.C. § 1412(a)(5), parents are not held to the same strict standard of placement as school districts are. *See M.S., supra,* 231 F.3d at 105; *Rafferty v. Cranston Public School Committee,* 315 F.3d 21, 26–27 (1st Cir.2002). While a court may consider the least restrictive environment issue, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement if the placement is otherwise appropriate. *M.S.,* 231 F.3d at 105, citing *Cleveland Heights–University Heights City School Dist. v. Boss,* 144 F.3d 391, 400 (6th Cir.1998).

## CONSIDERATION OF ADDITIONAL MATERIALS

IDEA itself empowers a Court to consider material outside the administrative record. 20 U.S.C. § 1415(i)(2)(B)(i)-(iii).

With these principles in mind, I turn to the administrative record.

### Statement of Facts

*History*

E.M. is a 15 year-old boy. From kindergarten through fifth grade, E.M. attended the Brewster Public Schools. He was identified as having attentional and distractability problems in kindergarten (initially misidentified as ADHD), and as speech impaired in the first grade. By second grade he had started to receive specially designed instruction in reading from the district; beginning in third grade, he received multi-sensory instruction by teachers trained in "PAF" (Preventing Academic Failure), a program for students exhibiting problems in the acquisition of reading skills. He was classified as "learning disabled and speech and language impaired" by Brewster's Committee on Special Education (CSE) in November 1999, when he was in the third grade. He is presently classified as learning disabled.

For fourth grade (2000–01), the CSE recommended that the student receive specialized reading instruction 30 minutes per day in a small group in a general education setting, and specialized language arts instruction for one period per day in a 15:1 inclusion setting (Dist Ex. F and G). He also received speech-language therapy two times per week, as well as various program and test modifications. *Id.*

In fifth grade (2001–02), the student received special class reading and language arts instruction, each for 45 minutes per day in a 15:1 inclusion setting, speech-language therapy three times per week, and two hours of direct instruction per week by a consultant teacher to assist with reading required for math, as well as two hours per week of speech-language therapy as extended school year services during the summer of 2001 (Dist.Ex. E).

E.M. did progressively better in school while enrolled in the Brewster Public Schools. Between fourth and fifth grade, while receiving special education services from defendant, E.M.'s reading comprehension improved from a 2.2 grade equivalent to a 3.1 grade equivalent; his Broad Written Language improved from a 1.6 grade equivalent in third grade to a 3.0 grade equivalent in fifth grade; and his Mathematics achievement improved to grade level. (Dist Exs. D, E, P and Y).

In April 2002, while the student was in the fifth grade, his parents arranged for a private neuropsychological evaluation. The evaluator's findings included identification of a "significant central language disorder with mild receptive features, mod-

erate expressive and anomic features, and marked speech praxis" as well as deficits in executive and executive-motor skills (Dist.Ex. N). The evaluator concluded that the student's speech dyspraxia was the primary cause of the difficulty with reading and recommended speech-language therapy services and consideration of the use of a whole word approach to reading instruction, using either the Orton–Gillingham or the Wilson method, until E.M. could read at the third grade level.

In June 2002, a second private evaluator conducted an assessment of E.M.'s literacy skills. He reported that the student demonstrated difficulty decoding words and deficits in language processing (Parents' Ex. 17). The evaluator recommended that the boy be taught using a multi-sensory approach such as the Orton–Gillingham or Lindamood–Bell methods. (*Id.*)

In September 2002, the parents unilaterally enrolled their son in sixth grade at Kildonan School (Parents' Ex. 16), which is not approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. (8 NYCRR § 200.7). Kildonan has been recognized by New York State's Office of Review as a "highly restrictive" placement. *Application of Kingston City School District,* SRO Dec. # 00–045. The student remained at Kildonan during the seventh grade (2003–04 school year). He made some progress during his first year at Kildonan but apparently regressed during the second. The parents and the school district settled their dispute over reimbursing the parents for those two years, but did so without prejudice to the District's position that the child could be provided with a FAPE in the public school.[1]

*The Preparation of the 2004–2005 IEP*

On July 13, 2004, the CSE convened for the student's annual review and to develop an IEP for his eighth grade year. (Dist. Ex. EE) The CSE recommended that the student receive special education instruction in English, Math, Science, Social Studies and Reading in a 15:1 general education inclusion setting, and also that he receive speech-language therapy in a small group twice a week for 30 minute sessions in a special location. (*Id*). The CSE recommended that during the summer of 2004 the student receive extended school year services of specialized reading three hours per day in a 15:1 special education setting and speech-language therapy twice per day for 30 minute sessions in a small group setting. (*Id*).

The CSE meeting was, however, infected with a major procedural error, as found by both the IHO and the SRO: it was improperly constituted. Members of the July 13, 2004, CSE included the student's mother, the CSE Chair, a tenth grade regular education teacher, an elementary special education teacher and an additional parent member. (*Id.*) The tenth grade teacher was neither a teacher of the student nor teaching a program that might be appropriate for the student. The special education teacher was not a teacher of the student, special education provider of the student, or a person responsible for implementing the IEP. (8 NYCRR § 200.3(c)(2)(ii) & (iii), *see also* 34 C.F.R. Part 300, Appendix A, Notice of Interpretation, Section IV, Questions 24, 26). Neither teacher was a proper participant in E.M.'s CSE.

Additionally, no speech therapist, school psychologist or representative of Kildonan,

---

1. I assume that this resolution removed the issue of liability for tuition under the pendency doctrine from the case, since experienced counsel, who have litigated dozens of IDEA cases before this court, did not brief the issue.

the student's pendency placement, was present. However, their absence did not give rise to procedural errors. As the special education administrator was capable of interpreting the instructional implications of the Speech and Language Evaluation and did so, no speech therapist was required (8 NYCRR § 200.3(c)(2)(vi)). As no new psychological evaluation was reviewed and no change to a program option with a more intensive staff/student ratio was considered, the participation of a psychologist was not required (8 NYCRR § 200.3(c)(v)). And, as the IHO found, "The absence of any representative from Kildonan was not for lack of an invitation from the District." (IHO Decision at 5).

The CSE did not reconsider evaluations and reports that had been considered in formulating the previous year's IEP, and finished the IEP without waiting for testing information from Kildonan, which was not received until August. The IHO and SRO did not find these to be procedural errors—indeed, the SRO did not deem them worthy of comment—and neither does this court.

*The Impartial Hearing and the IHO's Decision*

The parents declined to accept the IEP and continued to enroll their son at Kildonan. They sought an impartial hearing to determine whether the district should pay for their son's eighth grade year at Kildonan. The hearing was held over six sessions beginning November 22, 2004 and concluding May 24, 2005. The IHO handed down his decision, requiring the District to reimburse the parents for the cost of E.M.'s attendance at Kildonan (up to $28,000) in August 2005.

The IHO concluded that the parents had identified procedural errors in the composition of the CSE, but that these errors did not have any impact on the decisions reached at the meeting and so did not deny the boy a FAPE on procedural grounds. (IHO Decision at 5)

The IHO did conclude, however—erroneously placing the burden on the district rather than the parents (because *Schaffer* had not yet been decided)—that the IEP was not reasonably calculated to provide E.M. with a FAPE, and that Kildonan was an appropriate placement for the child. The IHO described both issues as "very close." He noted that the District had shown, largely through the testimony of the parents, that the student was making progress during his last years in public school and that the gaps between the student and his chronological peers actually widened during the three years when he attended Kildonan. (IHO Decision at 10–11). He also found that the District's specialized reading instruction and Kildonan's language training tutorial "are intended to serve many of the same purposes, as are the subject matter classes at the respective schools." (IHO Decision at 10).

The IHO observed (significantly, for the purposes of this appeal) that certain key testimony from various experts (as well as E.M.'s mother), to the effect that Kildonan offered E.M. a significant educational advantage because E.M. would receive instruction in reading and decoding via the Orton–Gillingham Method during his subject matter classes (or as the boy's mother put it, that reading instruction using Orton–Gillingham was "all day intensive" (Tr. 275–76)), was contradicted by both the Academic Dean at Kildonan (who testified that this was not the case, see IHO Decision at 9) and by a report of a psychologist's classroom observation (*Id*). The IHO noted that Kildonan did not offer E.M. speech and language therapy (IHO Decision at 13–14) or have any behavior intervention plan for the boy, despite the consistent comment that he had serious attentional issues (Id.) And he correctly

identified Kildonan as a "more restrictive placement." (IHO Decision at 15)

Nonetheless, the IHO ultimately concluded that the IEP was inadequate because "... [E.M.'s] deficits are so severe and his learning difficulties so profound that at the eighth grade curriculum level, he could [not] have kept up with the pace of instruction in the offered inclusion classes." The IHO also concluded that "... the program at Kildonan enables him to make meaningful progress with a level of frustration that is tolerable to him," even though "... the student's grades at Kildonan and his teachers' comments reflect an inconsistent performance during the 2004–05 school year and a decline from his performance during the 2003–2004 school year." (IHO Decision at 13). In other words, the IHO in effect concluded that the IEP was inadequate because Kildonan (by a narrow margin) was a better placement for the boy.

The record included that E.M.'s performance in the eighth grade was affected by his taking growth hormones and having to change the medication he was taking for his ADHD (*Id.*). The IHO also concluded that the educators at Kildonan "are not lacking objectivity in assessing the performance of the student," despite the fact that Kildonan eschewed standardized testing. (*Id*). For this, the IHO relied on writing samples created by the student at the beginning and the end of his eighth grade year (Parents' Ex. 2, see IHO Decision at 13). Significantly, the IHO rested this aspect of his decision on information that was developed *after* the parents made the decision to send the boy to Kildonan.

The IHO's determination that Kildonan was an appropriate placement was based largely, if not entirely, on what the SRO would later describe as "course descriptions in the student's progress reports, which described lessons and instructional activities, and upon the Academic Dean's statement that subject matter classes were organized to provide instruction in short segments designed to maintain the student's attention." (SRO Decision at 7).

The IHO declined to conclude that the failure of any representative of Kildonan to attend the CSE meeting or to provide the District with information in a timely manner equitably disentitled the parents to relief, saying, "I am unable to hold the Parents responsible for Kildonan's practices ... " (IHO Decision at 15).

*The Appeal to the SRO and The SRO's Decision*

The district appealed to the SRO, who reversed the ultimate decision on the ground that Kildonan was not an appropriate placement for E.M..

The SRO agreed with the IHO that the CSE was improperly constituted. However, he concluded that this alone, without more, denied the student a FAPE (and his parents' their right to meaningful participation), because no one at the meeting was able to discuss the specific curriculum requirement of the proposed inclusion class being recommended for E.M. for the 2004–05 school year. Nor could the teachers in attendance (neither of whom taught middle school) comment on the modifications and supplementary services and aides that might be provided to ensure that E.M. made progress in the general curriculum. "The lack of contribution compromised the development of the student's IEP, significantly impeded parental participation in the formulation of the IEP and denied the student educational benefits." SRO Decision at 6 (I have numbered the unnumbered pages of the SRO's decision). The SRO, like the IHO, placed the burden on the parents with respect to this issue; ironically, *Schaffer* was handed down on the same day as the SRO's deci-

sion, so he could not have known of the change in the law.

Because the SRO concluded that the procedural problem denied the child a FAPE, he did not otherwise opine on the adequacy of the IEP. Instead, the SRO went on to consider whether the parents (who, under both extant Second Circuit law and *Schaffer*, were the party with the burden of proof on all issues) had established that the services offered by Kildonan during the boy's eighth grade year met his special educational needs. He concluded that they did not.

The SRO's decision included an extensive discussion about Kildonan's implementation of Orton–Gillingham instruction in reading. He noted that the boy's mother and two expert witnesses had testified that it was important to E.M. to have Orton–Gillingham "carried across his full day of academics, especially ... where all of his subject matter is going to require that he access written materials to learn." (Tr. 433, quoted at SRO Decision at 7). These witnesses had supported the boy's placement in Kildonan because they were under the impression that he was getting precisely that—day long immersion in Orton–Gillignham reading. The SRO (like the IHO) then noted that all of this testimony was "refuted by the testimony of the Kildonan Academic Dean," who testified that reading instruction was not provided in content area classes and that students were actually not required to read for comprehension in those classes—either teachers or student volunteers read the material. (SRO Decision at 7). Thus, Kildonan's method of instruction did not permit the student to do his own reading (or writing, apparently) in subject matter classes, nor did it ask him to use reading skills throughout the school day. (Id.) The SRO found that "the student's need for reading instruction in content classes as recommended by [the parents'] three private evaluators, was not addressed at Kildonan." (SRO Decision at 8)

The SRO then addressed the Academic Dean's statement that subject matter classes at Kildonan were organized to provide instruction in short segments designed to maintain the student's attention. The SRO noted that there was very little in the record to enable anyone to evaluate how effectively Kildonan kept E.M.'s attention. He called particular attention to the May 24, 2004 report of defendant District's psychologist, which described a class of eleven children in which E.M. "listens passively while doodling" during teacher lectures. The SRO was unimpressed with the proof (or lack of proof) that Kildonan's small class size allowed teachers to identify and address student needs; he concluded that the fact that witnesses said it was so did not make it so. Indeed, he noted that what was observed was inconsistent with the methods described by the Academic Dean. (SRO Decision at 8).

Next, the SRO noted that the student had a diagnosis of ADHD and was receiving "different medications ... with varying success" to deal with that issue. The record revealed that the boy's difficulty maintaining focus "is described by most of his teachers in their progress reports" from the boy's earliest days there (October 2003) through the final progress report in 2005, which "includes comments from every teacher regarding the student's difficulty attending." Nonetheless, the SRO observed, "Nothing in the record offers insight into strategies in place at Kildonan to address the student's persistent difficulty with attention and focus." (SRO Decision at 8).

The SRO noted that the IHO had determined that E.M. made "significant progress" while in public school, based on results of standardized tests administered

prior to his placement in Kildonan, and further noted that subsequently administered standardized tests showed that the boy's performance gap relative to his peers was widening, not narrowing, during his years at Kildonan. The SRO discounted the conclusion reached by Kildonan witnesses (and the IHO) that standardized tests ought not be used to measure the student's performance, in view of the fact that his Kildonan teachers reported "inconsistent performance" during his years there. The SRO carefully and thoroughly analyzed the boy's standardized test results, and found that E.M. had made progress between the fourth and fifth grade, only to backslide between June 2003 (after one year at Kildonan) and the end of the 2004–05 school year (SRO Decision at 9). Of the IHO's conclusion that Kildonan teachers were capable of obtaining "objective qualitative measures of performance," the SRO said, "I am not persuaded ... because the record does not reflect the measures employed. If Kildonan teachers relied upon curriculum-based assessments geared toward measuring student progress in specific skills, under the circumstances of this case, they should have produced them. Further, [the parents] did not offer an adequate explanation of a statement on the Kildonan report of test results which notes that the student's standardized test scores 'provide a fair representation of the student's present language and arithmetic function,' (Parent Ex. 2 at p. 1), a statement which contradicts testimony by all three private evaluators." (SRO Decision at 10). The SRO therefore concluded that the IHO's decision that Kildonan staff used objective qualitative measures to monitor progress "is not supported by the record." (Id.)

Finally, the SRO addressed the District's claim that the IHO had discounted the relevance of the student's poor grades at Kildonan. The private evaluator who supervised tutors at Kildonan testified that E.M. made good progress in sixth grade but not in seventh grade. The evaluator attributed this decline to two things: illness and the increased demands of the seventh grade curriculum. She testified that his grades were "starting to improve" in the eighth grade, and that E.M. was taking more responsibility for completing assignments independently.

The SRO concluded that the evaluator's conclusory testimony about progress during the eighth grade year (the year at issue) was not supported by the record. E.M.'s October 2004 progress report showed grades of B-, C and two D+, but his final grades for the eighth grade year were one D, two C- and one C. The SRO also concluded that the teacher narrative reports did not support the witness' testimony; one progress report said the boy "never makes homework corrections which would increase his grade and understanding," and another said he "rarely follows directions or brings required materials to class." (Parents' Ex. 19).

The SRO also cited the testimony of the Academic Dean, who said that the boy's performance had improved, per teacher reports, since he changed his ADHD medication in January 2005. However, the SRO noted that Parents' Ex. 19, the April 2005 Progress Report, included statements that his class participation was "increasingly negative" and that the student "needs to work more on sharing tasks with his group members." And his year-end eighth grade report included remarks that E.M. "tends to try to evade work," "was often unprepared for class," and "has a hard time respecting the learning environment."

The SRO concluded as follows:

The narrative progress reports written by the student's teachers at Kildonan,

which reflected the student's performance over a two-year period between September 2003 and June 2005, suggested some inconsistencies in the student's performance but were consistent in their description of the student's difficulties with attention and completion of assignments. Although these two areas of concern were identified and reports indicate that they persisted throughout the two-year period, significantly, the reports do not explain how or whether these difficulties were addressed ... Likewise, the record does not reflect how Kildonan addressed the student's attentional deficits, which progress reports suggest remain a persistent problem. The Academic Dean testified that Kildonan's small class size allowed teachers to identify and address needs, and offered examples of general strategies employed to address attentional difficulties ... The private evaluator who supervised Kildonan's language tutors testified that Kildonan teachers are "keenly tuned and keep records of ... how often they are on task, off task" [but] The record does not substantiate this testimony ... Inconsistent with evidence of refocusing, the report of petitioner's school psychologist who observed the student in May 2004 noted that the student was "doodling" on two occasions during a lesson but was not prompted to refocus. (Dist Ex. L.) Given the testimony by respondents' private evaluator and the Academic Dean regarding the small class size at Kildonan and how this small class size allows for addressing individual needs, it is noteworthy that teacher reports continually identified the student's needs but failed to demonstrate strategies to address them.

(SRO Decision at 11). The SRO concluded that respondents failed to demonstrate that Kildonan was appropriate to their son's special education needs and reversed the tuition award.

The parents filed this appeal.

### Conclusions of Law

Applying *Walczak* deference to the SRO's extremely thorough and well-reasoned decision, the court affirms his conclusions.

Because of *Schaffer*, I have to analyze the evidence differently that the IHO and SRO did, and place on the parents the burden of proving the inadequacy of the IEP in the first instance. Thus, the IHO should have determined whether the parents proved that the IEP or the process used to create it denied their son a FAPE—not whether the District proved that the IEP was adequate.

With respect to the first *Burlington* prong: the SRO and the IHO disagreed about the prejudicial impact of the District's failure to have on the CSE a middle school teacher who was familiar with the inclusion programs that were being offered to E.M. and who could answer questions about them. The SRO found the violation to be sufficiently prejudicial so as to deny the boy a FAPE. This court is unable to conclude that the SRO's determination in this regard was incorrect (or, for that matter, that the IHO's contrary conclusion was correct). I would be substituting my own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so, in violation of the law in this Circuit.

The District urges that the SRO's conclusion should be reversed because the record does not indicate that the mother asked any question about inclusion that went unanswered. The short response is that if the people who could offer meaningful information were not at the meeting, it is impossible to determine whether the provision of that meaningful information

would have prompted additional questions from the parent. As the SRO noted, the Department of Education requires the participation of a student's "regular teacher" (i.e., a teacher who is or may be actually teaching the child under the IEP) in order to provide input on modifications and supplementary aids and services that would allow the child to remain in the regular education environment to the maximum extent possible—i.e., to discuss how to teach the child. State regulations require a school district to designate a regular education teacher to participate on the CSE who, at a minimum, teaches the subject matter or grade level in one of the programs that might be appropriate for the child. (SRO Decision at 5). According to the SRO, the constitution of the CSE in E.M.'s case significantly impeded the parents' participation in the formulation of the IEP.

The court is mindful of the recent amendment to IDEA, which makes clear that only procedural inadequacies that *significantly impede a parent's opportunity to participate* in the IEP formulation process will result in a finding of denial of a FAPE. That amendment was not in effect when the IEP meeting here under review took place (July 13, 2004), and thee SRO specifically stated that he was applying IDEA as it existed at the time of the hearing. (fn.2). However, his finding that the make-up of the SE "significantly impeded" the parents' opportunity to participate in the formulation of the IEP actually adopts the standard of the amendment, and thus renders the procedural infirmity prejudicial under either version of IDEA.

Because he concluded that there were grave procedural flaws in the composition of the CSE, the SRO never reached the question of whether the IEP that was devised would have afforded E.M. a FAPE. Because I affirm the SRO on the procedural issue, I need not reach this question, either.

█ I note, however, that in the initial administrative decision, the IHO improperly conflated this issue with the issue of whether Kildonan was a proper placement for E.M.. His analysis basically compared the IEP with the testimony about what the boy was offered at Kildonan and concluded that, by a narrow margin, Kildonan was the "better" placement, because E.M. was able to make meaningful progress "with a level of frustration tolerable to him." But that analysis was improper. The issue is not whether Kildonan is a superior placement, but whether the parents proved that the district's IEP failed to offer enough in the way of educational services to afford the boy a FAPE. Were I to address that issue, I would hold that the parents have not met their burden.

The IHO concluded—with overwhelming support from the record, including the testimony of E.M.'s mother—that the services provided by the District when E.M. was last a student there "served the student well." IHO Decision at 13. The program devised by the CSE for the boy's eighth grade year put him in an inclusion setting for core academic subjects, but with a special education teacher in the classroom, who would assist E.M. with re-focusing, redirection and instructional strategies (i.e., who would address his attentional issues). Additionally, he was offered specially designed reading instruction in a small group setting, using the Wilson Methodology (one of the methodologies, along with Orton–Gillingham, that was recommended by the neuropsychologist hired by the parents), testing accommodations and classroom modifications appropriate for his dyslexia, ADHD and lack of organizational skills, as well as extended year (summer) programs in speech and reading (which were expressly declined by

the parents). Coupling the fact that the parents' expert recommended the teaching method for reading proposed by the District with the District's provision of special services directed toward remediating the boy's serious attentional issues and his speech deficits, I cannot say that the parents have established that the IEP was inadequate, or that their son would not have received a FAPE in the public school setting.

 In the end, however, I, like the SRO, conclude that the parents failed to prove that Kildonan was a proper placement for their son. Thus, even if the IEP did not offer the boy a FAPE, the parents are not entitled to tuition reimbursement.

This court is quite familiar with The Kildonan School. It is the school of last resort selected by most parents of severely dyslexic children in the Hudson Valley. Even if dyslexia were E.M.'s only problem, I, like the SRO, have my doubts about the IHO's conclusion that the program was efficacious for the boy.

There is evidence in the record indicating that, at the time the IEP was formulated (which was mid–2004), E.M. was, if not thriving, at least doing somewhat better at Kildonan in the area of reading. Certain standardized tests administered to E.M. in the spring of 2004 (at the end of his seventh grade year) revealed that his standard and percentile scores in reading and spelling increased from where they were when E.M. left the Brewster schools at the end of 2002. (SRO Decision at 9). However, those same test scores indicated that E.M.'s gaps in achievement relative to his peers were widening. Moreover, other tests administered at Kildonan revealed that the boy was only reading at the third grade level in reading when he entered the eighth grade (Parents' Ex. 2 and IHO Decision at 7)—approximately the same level he had been in the fifth grade in

Brewster. (See Dist. Ex. D, P). Per those tests, E.M. did no more than hold his own over that three year period; he made no forward progress. That could well be because the boy was not being given the all-day immersion in reading and writing that all the experts testified he required. The undisputed evidence from the person who was in a position to know—the Academic Dean at Kildonan—was to the effect that others read for E.M. in his content area classes, and that he was only required to read during the one period a day when he was in a remedial reading class. (For a fuller discussion of this issue, see below).

Moreover, as the SRO so cogently explained, reading was not E.M.'s only issue. The boy had serious attention deficits and problems completing work. These were repeatedly alluded to by his teachers in their reports, but Kildonan had absolutely no plan for addressing them. The SRO's analysis on this point—much of which I have already quoted in this opinion—is clearly borne out by the record. The fact that Kildonan's Academic Dean testified about the benefits of small class size is of no moment if the teachers of those small classes did not identify and address the child's needs. The Academic Dean was unfamiliar with E.M.'s specific case, but the repeated comments by teachers about his inattention were not accompanied by strategies for dealing with that issue. The records supposedly kept by Kildonan teachers about whether children were on or off task do not appear in the administrative record; and observation of the boy in the classroom in May 2004—just before the challenged IEP was formulated—found him "doodling" and his teachers indifferent. It is extremely telling that, a year later, E.M.'s literature teacher found it so "time-consuming" to prompt the boy to refocus (suggesting that she needed to do it so often) that she relegated talking to

him to after class hours—a strategy that is of little or no benefit in refocusing the wandering student mind on the task before it. If Kildonan teachers found it too time-consuming to deal with one of E.M.'s most important educational issues, it is hard for this court to fathom why the District should be compelled to pay for his attendance there.

The parents argue that their strategy (developed with Kildonan) to deal with E.M.'s attentional issues was "non-educational approaches, i.e., medical treatment." (Plaintiffs' Br. at 18). Medical intervention is used, often with great success, with ADHD children. But the SRO did not suggest that medical intervention was inappropriate. When medication is not enough—and it is obvious from the teacher comments that it was not enough for E.M.—the school needs to devise a strategy to keep the student on task. All the evidence in the record suggests that the boy had less success with medication than other children experienced. Yet when medication did not control the boy's attentional issues, Kildonan appears to have abdicated.

Other evidence in the record reinforces the SRO's conclusion. E.M. had significant speech deficits—a disability that contributed to (and perhaps caused) his difficulty with reading, according to the parents' neuropsychologist (SRO Decision at 2). The undisputed evidence demonstrates that Kildonan offered the boy no speech-language therapy in the three years he attended the school. (Tr. 387). The speech-language expert retained by the parents conceded at the hearing that E.M. had made gains in articulation skills as a result of the District's intervention in speech language. (*Id.*) Although the SRO accorded this factor no weight, I conclude that it augurs in favor of a find-ing that Kildonan was not an appropriate placement for the boy.

The parents argue that the SRO made credibility findings that were more appropriately left to the IHO. That is incorrect. The SRO did not decide to disbelieve evidence given by various witnesses called by the parents. Rather, the SRO tested assumptions relied on and conclusions reached by the witnesses against the actual evidence in the record. It turned out that certain conclusory testimony by witnesses about what the Kildonan program provided for E.M. did not stand up to scrutiny, because they were based on assumptions that proved inaccurate.

The best example: E.M.'s speech-language therapist and two private evaluators—the tutor who conducted the boy's literacy evaluations and the tutor who was employed as a supervisor at Kildonan—all testified that E.M. required all-day intensive immersion in Orton–Gillingham reading and writing, rather than having one or two periods a day of remedial instruction in reading and writing. The speech-language therapist specifically recommended that E.M. receive Orton–Gillingham instruction "throughout the day." (Parents' Ex. 12 at 8); the tutor testified that the student needed to be in a setting in which some methodology "like the Orton–Gillingham methodology" is "applied all day, across content areas" (Parents' Ex. 16 at 12); and the tutor testified that E.M. needed Orton–Gillingham "carried across his full day of academics." (Tr. 433)

All three experts testified that they believed Kildonan provided the needed immersion exposure to Orton–Gillingham—i.e., exposure throughout the school day. None of the three, however, had actually observed the use of Orton–Gillingham in academic courses at Kildonan. That, as the SRO found, is because Kildonan does not use Orton–Gillingham in content/academic

courses. The school's Academic Dean (who, one assumes, is familiar with its teaching methods) testified without contradiction by any knowledgeable person that Orton–Gillingham reading instruction was "addressed primarily in the language training tutorial" (ironically, by a tutor who is not an Orton–Gillingham, see IHO Decision at 10, Tr. 710) and was not provided in content area courses, where reading for comprehension was done for the student (not by the student), either by the teacher or by a student volunteer. (Tr. 697–99) The SRO correctly concluded that this testimony "does not support claims by the private speech-language therapist that, at Kildonan, the student was expected to do all his own writing and all his own reading in subject area classes and was able to and asked to use reading skills throughout the day ... nor does it support similar assertions made by the two other private evaluators ... and by the student's mother." (SRO Opinion at 7–8)

The SRO was clearly correct in concluding that Kildonan did not provide what the various evaluators said the boy required. Since the issue to be decided is whether the private school offers an educational program that meets the child's special education needs, comparing what the evaluators say the child required with what was actually offered at the private school is precisely the sort of analysis the SRO was expected to perform.

For the same reason, it cannot be said that the SRO "disregarded" the testimony of these three experts. Rather, he accepted at face value their professional evaluation about what E.M. needed from a school. What he did not accept was their uninformed supposition that Kildonan offered what the boy required. His reason for rejecting their conclusion was the testimony of Kildonan's Academic Dean, who well knew what the school's curriculum included. Therefore, the SRO properly concluded that, if the boy needed all-day immersion in Orton–Gillingham (as the experts said), then Kildonan—which did not offer him all-day immersion—was not a proper placement.[2]

The parents next complain that the SRO failed to evaluate their decision to place the boy at Kildonan for his eighth grade year based on information that was available to them at the time of the placement decision, and instead improperly evaluated it using information that was gathered post-placement. (Pl. Br. At 22) This information included the boy's grades during the 2004–05 school year and the results of tests administered during the year, as well as teacher evaluation reports generated during that year. They allege that this imposed on the parents an impermissible standard—a guarantee of success.

Defendant (and I) read this as suggesting that it is improper to evaluate a decision to place a child in a school using retrospective evidence rather than (or in addition to) prospective evidence. Plaintiffs cite no case law in support of this proposition, but the District is not wrong in calling the court's attention to the recent Second Circuit case *D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595 (2d Cir.2005). In *D.F.*, the Second Circuit cited with seeming approval decisions from the First, Third and Ninth Circuits which held that inquiry into whether an IEP was valid was necessarily prospective, such

**2.** The parents' argument that the SRO made improper factual findings is, at least on this issue, misplaced, because the IHO made exactly the same factual finding as the SRO about the erroneous assumption of the expert evaluators (see IHO Decision at 9). The problem, noted above, is that the IHO did not properly analyze *the implications* of this factual finding. The SRO did do the requisite analysis.

that consideration of proof about progress actually made (or not made) pursuant to the IEP is "not altogether proper." *D.F.*, supra., 430 F.3d at 598. However, the Court of Appeals went on to say, "Notwithstanding the approach of the, First, Third and Ninth circuits—and apparent decision of several district courts in this circuit to follow that approach—*this court has not, as yet, decided if it is error to consider retrospective evidence in assessing the substantive validity of an IEP.*" *Id.* at 599. (Emphasis added). It remanded the case to my colleague, Judge Robinson, so he could address that question in the first instance.

Several observations are in order.

First, as the above quotation from D.F. makes clear, the validity of using retrospective evidence to evaluate *either* an IEP or a parent's private placement decision remains unsettled in this Circuit.

Second, even if the Circuit were to adopt the position used in the First, Third and Ninth Circuits for the evaluation *of IEPs,* it is far from clear that the same standard would be applied when the issue on the table is the *propriety of a particular private school placement,* as is the case here. In at least one case, *M.S., supra.,* 231 F.3d at 100, 104, the Second Circuit affirmed the SRO's finding that a private school placement was inappropriate, even though that finding was predicated in part on the student's lack of progress in the private school.[3]

Third, the SRO did not rely solely on retrospective evidence. Much of the evidence that undergirds his decision (including specifically his determination that Kildonan did not provide the sort of day-long immersion in Orton–Gillingham reading

and writing that E.M. required) was available at the time the parents rejected the IEP in favor of a private placement. For example, E.M.'s parents could easily have ascertained prior to the 2004–05 school year that their son would not be doing his own reading and writing in content area courses at Kildonan—all they had to do was talk to the school's Academic Dean! Additionally, the finding concerning Kildonan's lack of any strategy to deal with the boy's attentional issues is supported by teacher evaluations dating back to the beginning of the 2003–04 school year (see SRO Decision at 8, 11).

So even if I were to ignore the evidence from E.M.'s eighth grade year, I agree with the SRO that the parents failed to demonstrate that Kildonan was a proper placement for their son. His deteriorating performance in the seventh grade (clearly evidenced in the record), Kildonan's documented lack of any plan to timely respond to his attentional issues, and the Academic Dean's candid description of what Kildonan did and did not offer this particular child, taken together, suffices to support that conclusion. The boy's eighth grade performance—and the year-end measurements that are part of the record—merely confirms what the evidence in existence at the beginning of the school year had already demonstrated: Kildonan was not a proper placement, so the parents are not entitled to reimbursement.

Fourth, I note that at least some of the information in the record that post-dates the completion of the IEP was provided to the SRO at the hearing *by the parents,* not the District (See, e.g., Parents' Ex. 2, and 16, which provide test data and teacher evaluations that were performed during the boy's eighth grade year, after the par-

---

**3.** Indeed, the Circuit suggested in *D.F.* that retrospective evidence might well be the sort of "objective evidence" needed to evaluate an

IEP in some circumstances. See 430 F.3d at 599, n. 3.

ents made the decision to keep him at Kildonan). Even if the Second Circuit eventually adopts the rule that the use of so-called "retrospective" evidence is "not altogether proper" (a carefully-chosen phrase, one that suggests the use of such evidence cannot be ruled out in every circumstance), a party who introduces such evidence into the record cannot be heard to complain if the SRO takes it into account—and runs the risk, as these parents did, that the SRO will interpret the information differently than they do.

Finally, nothing in the SRO's decision imposed on the parents the obligation to demonstrate that Kildonan was a "perfect" placement for E.M.. Certainly the SRO's emphasis on the lack of any objective evidence of progress by E.M. (SRO Decision at 10) does not imply any such obligation. The SRO's decision acknowledges that the proper standard is whether the private school offers an educational program that meets the child's special education needs. (SRO Decision at 6). His conclusion that Kildonan did not meet E.M.'s special needs in numerous respects is sound and fully supported by the evidence. This court will not disturb it.

### Conclusion

Because I affirm the SRO's determination that Kildonan was not a proper placement for E.M., I grant defendant's motion for summary judgment and deny plaintiff's cross motion. The complaint is dismissed. The Clerk of the Court shall enter judgment for defendant District and close the file.